[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**BC**

**FILED**
9/24/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

JKS

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PETE SZMURLO, | ) | **Case Number**:  1:25-cv-07099 |
| Plaintiff | ) | |
| | ) | **Judge:**  John J. Tharp, Jr. |
| v. | ) | |
| TK ELEVATOR (THYSSEN KRUPP), et al. | ) | **Magistrate Judge:** |
| Defendant | ) | |

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## PLAINTIFF'S COMBINED MOTION TO ALTER OR AMEND JUDGMENT UNDER FED. R. CIV. P. 59(e) AND FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60(b)

Plaintiff Pete Szmurlo, pro se, respectfully moves this Court to vacate its void Judgment and Sanctions Order entered August 27, 2025 (ECF Nos. 53, 54). The Judgment is void for lack of subject-matter jurisdiction, as the face of the 2025 Complaint alleges only new, independent state-law torts with no federal nexus. Newly discovered evidence proves the sole basis for removal—an alleged grievance—was a fraud, and the filing injunction unlawfully blocks Plaintiff's First Amendment right to petition state courts while parallel agency proceedings are pending. The Judgment is also void for lack of subject matter jurisdiction, as the claims in the 2025 Complaints are new, non-preempted state-law claims that arose after the final dismissal of the time-barred LMRA claim from the first action. The filing injunction, predicated on this void judgment and extending to state court, is an ultra vires act that unlawfully denies access to the only forum with proper jurisdiction.

## INTRODUCTION

The District Court's August 27, 2025, Order is predicated on a fundamental legal error: the application of res judicata to new claims that are factually and legally distinct from those in the prior action. These new claims are for independent state-law torts—defamation, civil conspiracy, IIED—based on conduct occurring in 2025. Under the controlling tests of *Lingle v. Norge* and *Caterpillar Inc. v. Williams*, these claims are not preempted by the LMRA. The Court's prior finding that "no LMRA claims [are] possible since post 6 months" extinguished the only basis for federal jurisdiction. The resulting judgment is void, and the filing injunction is an unlawful denial of a state court remedy. (1) it misapplied the doctrine of res judicata by failing to recognize that the 2025 Complaints plead new, distinct claims based on new factual events that

occurred after the dismissal of the 2024 action; and (2) deriving from this error, it issued a filing injunction without a valid basis for federal subject matter jurisdiction; and (3) asserting subject matter jurisdiction over state-law claims that were not completely preempted by the LMRA. A judgment premised on a lack of subject matter jurisdiction is void. *See United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir. 2000). Also see *Glacier Northwest v Teamsters.*

**FACTUAL BACKGROUND & NEWLY DISCOVERED EVIDENCE**

1. September 8, 2025, SOX Disclosures Prove Ongoing Fraud and Waive Privilege. Respondent's disclosures in the SOX proceeding constitute judicial admissions and a subject matter waiver under Federal Rule of Evidence 502, proving the blacklisting and fraud are ongoing in 2025. These disclosures were not accidental; they are determinate negations of their position in this forum. The question is not if a conspiracy can be pleaded—as the USAO conceded it could be—but where. The answer, as *Huon v. Breaking Media* instructs, is state court for these "actionable user comments" distinct from any prior "article."

2. The 2025 Complaint Alleges New Torts by New Actors. The First Amended Complaint (both 6063 and 7621) alleges conduct in 2024 and 2025 by new tortfeasors—specifically, attorneys from Fisher Phillips (Danielle Kays)—who were not involved in the 2023 OSHA proceeding handled by Paul Waters. These new torts include defamatory submissions to the CCHR in June 2025 and ongoing blacklisting. (*See Ex. D Pl. Mo. SOX 91125*, pp. 18-19, ¶¶ 1-3).

3. The "Grievance" was a Fraud, Destroying Preemption. Defendants secured removal by claiming Plaintiff's state-law claims were preempted by the LMRA because they related to a "grievance." This was false.

   · Exhibit A (Judicial Admission of "No Grievance"): Respondent's counsel, Paul Waters, stated under oath in the 2023 OSHA proceeding that "no grievance was filed." (25-1941, *Pl. mo. Compel transcript*, p. 2, Statement of Facts). This is a judicial admission.

· Exhibit B (501(c)(5) Financial Records Prove Fraud): Newly obtained financial records (Form 990) for the National Elevator Industry Educational Program (NEIEP) and related 501(c)(5) entities show de minimis or zero dollars spent on grievance proceedings for the relevant period. This objective evidence proves the alleged grievance apparatus did not exist, making Defendants' preemption argument a sham. This fraud triggers the exception to the Noerr-Pennington doctrine. The removal was not a good-faith petitioning activity but an objectively baseless sham to misuse the judicial process for anti-competitive retaliation. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511 (1972).

3. Evidence of a Fraud upon this Court. Exhibit C (The Falsified Transcript): The official transcript of the November 21, 2024, hearing, provided on August 29, 2025, is materially falsified. It omits critical statements, including a judicial acknowledgment of criminal conduct and a party admission regarding illegal recording. (See *Pl. Mo. Compel 9825*, pp. 2-3). This is newly discovered evidence of a fraud upon the court.

4. Admissions of Ongoing Conduct in 2025. Exhibit D (SOX Disclosures): Correspondence from Respondent's counsel on September 8, 2025, in the pending SOX proceeding (OALJ 2025-SOX-00034) judicially admits that the fraudulent conduct is "ongoing." (See P*l. Mo. SOX 91125*, p. 17, ¶ 2). This proves the 2025 claims are timely and distinct from 2023.

**ARGUMENT**

**I. THE JUDGMENT IS VOID UNDER RULE 60(b)(4) BECAUSE THIS COURT LACKED SUBJECT MATTER JURISDICTION.**

A federal judgment is void if the court lacked subject matter jurisdiction. *United States v. Tittjung,* 235 F.3d 330, 335 (7th Cir. 2000). This Court's jurisdiction was predicated on the erroneous conclusion that the 2025 Complaints were barred by res judicata and preempted by the LMRA. Both conclusions are legally untenable. The 2025 Complaint alleges only state-law

torts—defamation, civil conspiracy, IIED—based on conduct in 2024-2025. The LMRA preemption defense, which Defendants fabricated by alleging a non-existent grievance, does not appear on the face of the well-pleaded complaint and cannot create federal question jurisdiction. *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908). Because the "four corners" of the Complaint reveal no federal question, this Court lacked jurisdiction from the moment of removal, and the Judgment is void. *Myers v. Cnty. of Lake,* 30 F.4th 588, 592 (7th Cir. 2022).

**A. The 2025 Complaints Plead New, Independent State-Law Claims Based on New Facts That Could Not Have Been Litigated Earlier.**

The Judgment is Void for Lack of Subject Matter Jurisdiction. Legal Standard: A judgment is void if the court that rendered it lacked jurisdiction over the subject matter. Fed. R. Civ. P. 60(b)(4). Application to the Case: The Defendants removed this case based on LMRA § 301 preemption. However, a close reading of the FAC shows that the core of the new claims is based on Illinois statutory law (IPRRA, IHRA, Whistleblower Act) and common law torts (defamation, IIED) that are independent of the CBA. Plaintiff waives any federal ERISA, or IHRA claims, or LMRA claims. The question is whether these state law claims are "substantially dependent on an analysis of the CBA." *Allis-Chalmers Corp. v. Lueck*. For example, determining if a statement to CCHR/OSHA in 2025 was defamatory requires asking if it was false and made with malice, not what the CBA says about discipline. The retaliatory discharge claim is based on the public policy of refusing to violate safety laws (ASME standards, CDL licensing), which exists independently of any CBA.

The doctrine of res judicata requires an identity of the cause of action. *Barr v. Bd. of Trustees of W. Ill. Univ.*, 796 F.3d 837, 840 (7th Cir. 2015). The 2025 Complaints, however, are based on a "new set of facts" that create separate and distinct claims. *Czarniecki v. City of Chicago*, 633 F.3d 545, 550 (7th Cir. 2011).

1. New Harms Post-Dismissal: The Complaints allege defamatory statements made to the CCHR on April 15, 2025, and ongoing blacklisting conduct through July 2025. (First Am. Compl. ¶¶ 34, 74). These are new publications causing new injuries, which restart the statute of limitations and constitute new causes of action. See *Huon v. Breaking Media*, and *Caroll v Trump I & II* (each republication is a new injury).

2. Fraudulent Concealment Tolling: Defendants concealed the falsity of their records through fraudulent means, including backdating documents. This fraud prevented the discovery of the true cause of action until after the first case was dismissed. *Clay v. Kuhl,* 727 N.E.2d 217, 223 (Ill. 2000); (First Am. Compl. ¶¶ 11-14, alleging metadata proving backdating not discovered until September 2023 and later).

3. Impossibility Doctrine: The claims pleaded were impossible to bring earlier because the fraudulent conduct had not been fully discovered or, in the case of the 2025 publications, had not yet occurred. A claim that does not exist cannot be litigated. See *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).

**B. The LMRA Preemption Defense Fails as a Matter of Law; There is No "Parallel, Viable Federal Claim."**

The "complete preemption" doctrine that permits removal exists only if the state law claim can be recharacterized as a viable federal claim. *Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8 (2003)*. This Court, in the first action (Szmurlo I), explicitly found that any potential LMRA "hybrid" claim would be barred by the six-month statute of limitations. (See Defs.' Reply, ECF No. 52, at 5-7, in 1:25-cv-07099).

· No Federal Claim Exists: Because the only conceivable federal claim is time-barred, there is no federal cause of action to which the state claims can be converted. The duties not to defame, conspire, or intentionally inflict emotional distress are independent state-law duties owed to

every citizen, and their resolution does not require interpreting the CBA. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 407 (1988) (preemption applies only if claim is "substantially dependent" on CBA analysis); *Caterpillar Inc. v. Williams,* 482 U.S. 386, 398-99 (1987) (the well-pleaded complaint rule governs).

· Jurisdictional Defect is Fatal: This Court, having recognized the LMRA time-bar, was obligated to remand the case for lack of subject matter jurisdiction once it determined the 2025 Complaints alleged independent state claims. Its failure to do so renders the subsequent judgment void. *Myers v. Cnty. of Lake,* 30 F.4th 588, 592 (7th Cir. 2022) ("Without subject-matter jurisdiction, a federal court must dismiss the case.").

## C. The Prior Dismissal Was Not a "Final Judgment on the Merits" for Res Judicata Purposes.

· Legal Standard: Res judicata requires a final judgment on the merits. A dismissal for lack of subject matter jurisdiction is not an adjudication on the merits. Fed. R. Civ. P. 41(b) and 54b. The court's April 4, 2025, Order in Szmurlo I (ECF 156) dismissed the case because it found the claims were preempted by § 301 of the LMRA. Legal Preemption is a jurisdictional doctrine. When a state claim is completely preempted, it is recharacterized as a federal claim under § 301. If it is then found to be untimely (as the court noted, "no LMRA claims [are] possible since post 6 months"), the dismissal is for failure to state a claim upon which relief can be granted, but it is rooted in the court's initial jurisdictional finding. The District Court in the present case treated the Szmurlo I dismissal as a merits-based final judgment. However, the logical conclusion of the Szmurlo I court's own reasoning is that it never had proper subject matter jurisdiction over a non-preempted state law claim, and the LMRA claim was time-barred. A dismissal on statute of limitations grounds for a federally preempted claim is not a "merits" dismissal of the underlying

state law claims for res judicata purposes when the plaintiff re-files those state law claims in state court. The court's res judicata ruling is a manifest error of law.

**D.The First Amended Complaint (FAC) Pleads New, Factually Distinct Claims Arising from Post-Termination, Non-CBA Conduct.**

· Legal Standard: Res judicata does not bar claims that could not have been brought in the earlier action because they had not yet accrued. "A claim accrues when the plaintiff has a complete and present cause of action." The FAC meticulously details actions that occurred after the filing of the original complaint on August 26, 2024, and even after its dismissal on April 4, 2025. These are not merely "new legal theories" on the same facts; they are new factual occurrences: April 15, 2025, CCHR Filing: This is a new, separate publication of alleged defamatory statements to a government agency. Under Illinois law *(Huon v. Breaking Media)*, each republication can constitute a new injury with its own statute of limitations. Ongoing IPRRA Violations (820 ILCS 40/): The alleged act of maintaining falsified records in a personnel file is a continuing violation. Each day the records remain un-corrected is a new statutory violation. These ongoing violations were actively occurring at the time of the May 7, 2025, refiling. 2025 Blacklisting Statements: The FAC alleges specific defamatory statements made to competitors (Kone, Schindler, Otis) in 2025, causing ongoing blacklisting.These post-2024 actions are separate from the 2023 termination and grievance process. Their resolution does not require interpreting the CBA; they concern Defendants' independent, post-employment tortious conduct (defamation, civil conspiracy, IIED). Impossibility Doctrine: The claims pleaded were impossible to bring earlier because the fraudulent conduct had not been fully discovered or, in the case of the 2025 publications, had not yet occurred. A claim that does not exist cannot be litigated.

**II. THE FILING INJUNCTION IS AN UNLAWFUL, VOID SANCTION THAT DENIES ACCESS TO THE ONLY PROPER FORUM.** The filing injunction, which prohibits filing

suits in state court, is a severe remedy that is void where the underlying judgment is void. *In re African-American Slave Descendants' Litig.*, 471 F.3d 754, 757 (7th Cir. 2006).

**A. The Injunction Violates the Anti-Injunction Act.** The Court's attempt to enjoin state court filings under the All Writs Act and Anti-Injunction Act is particularly egregious. A federal court cannot "protect or effectuate its judgments" when the judgment being protected is a void dismissal for lack of jurisdiction. 28 U.S.C. § 2283. The injunction constitutes an unlawful federal interference with state judicial processes.The All Writs Act and Anti-Injunction Act, 28 U.S.C. § 2283, permit a federal court to enjoin state proceedings only "to protect or effectuate its judgments." A void judgment provides nothing to protect or effectuate. The injunction here is a blatant and unlawful federal interference with state judicial processes. See *Adkins v. Nestle Purina PetCare Co.,* 779 F.3d 481, 483 (7th Cir. 2015).

**B. The State Court is the Proper and Convenient Forum.**The Circuit Court of Cook County has consistently asserted jurisdiction over these matters, including granting fee waivers and setting management dates. (See Cook County Docket, Case No. 2025L007621). This Court's injunction denies a state court remedy where a legal forum is willing and able to adjudicate the merits, which is an improper purpose for a filing injunction. Cf. *Snap Inc. v. Brown*, No. 2:25-cv-00490, 2025 WL 3204525 (D. Utah June 23, 2025).The injunction is predicated on the erroneous dismissal of the 2025 Complaints on res judicata grounds. Since that dismissal was for lack of subject matter jurisdiction, the injunction lacks a valid foundation.

**III. RELIEF UNDER RULE 59(e) IS APPROPRIATE TO CORRECT A MANIFEST ERROR OF LAW.** The Court's dismissal constituted a manifest error of law by ignoring the fundamental principle that a court must have subject matter jurisdiction to act. A Rule 59(e) motion is proper to correct such a fundamental error. *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 174 (1989). The integrity of the judiciary is paramount. The newly discovered evidence of

transcript falsification reveals a corruption of the judicial process that demands correction. The Court's Judgment is void, was obtained by fraud, and rests on a manifest error of law.

## IV. RELIEF UNDER RULE 60(b)(6) IS WARRANTED DUE TO EXTRAORDINARY CIRCUMSTANCES. 60(b)(2) AND (3) BASED ON NEWLY DISCOVERED EVIDENCE OF FRAUD.

The evidence in Exhibits A, B, and C could not have been discovered before the Judgment with due diligence. It proves the foundational premise of Defendants' removal—a grievance—was a known fraud. A judgment procured by fraud cannot support res judicata. "Fraud vitiates everything." This newly discovered evidence warrants setting aside the Judgment. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 245-46 (1944).

**A.** The combination of a void judgment, an unlawful injunction denying access to any court, and the manifest injustice of being barred from litigating new, distinct claims constitutes "extraordinary circumstances" justifying relief. *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005). This Court's actions have created a jurisdictional vacuum, leaving Plaintiff

**B.** The combination of a void judgment, a fraud upon the court, the violation of multiple abstention doctrines, and the denial of any forum constitutes "extraordinary circumstances" justifying tolling relief. See *Doe V Hastert,* and ECF 15 in 07099, *Pl. Mo. Doe v Hastert Doctrine "Immunity"*. This Court's actions are ministerial, ultra vires, and form the basis for a new lawsuit.

**C. The Falsified Transcript is Newly Discovered Evidence of Fraud.** On August 29, 2025, Plaintiff obtained the transcript of the November 21, 2024, hearing (the "Transcript") pursuant to this Court's June 25, 2025, Order (ECF 181). The Transcript contains material, intentional falsifications that were not and could not have been discovered with due diligence before the Court's April 30, 2025, dismissal. See Fed. R. Civ. P. 60(b)(2). These falsifications

include, but are not limited to, the insertion of fabricated "admissions" and the omission of critical statements regarding jurisdiction.)

This falsification constitutes a fraud on the Court under Rule 60(b)(3) and the inherent power of the court. "Fraud upon the court" is limited to fraud which seriously affects the integrity of the normal process of adjudication. *Harre v. A.H. Robins Co.*, 750 F.2d 1501, 1506 (11th Cir. 1985). The deliberate falsification of the official record by a court officer is the quintessential example of such fraud. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46 (1944).

**D. This Fraud Vitiates the Foundation for Res Judicata.** The doctrine of res judicata requires a prior valid and final judgment on the merits. A judgment procured by fraud is voidable and cannot support a claim preclusion defense. "Fraud vitiates everything." The Court's reliance on its own prior, fraudulently-obtained rulings to support res judicata is a manifest error of law. The newly discovered evidence proves the entire adjudicative process was corrupted, nullifying any claim of finality.

**E. Legal Error (Rule 60(b)(1)):** The Court committed a clear legal error by applying res judicata to bar claims that are based on new, post-filing harms, including the ongoing conspiracy to falsify the court record itself. Claims that accrue after the filing of a prior complaint are not barred.

**F. Changed Circumstances (Rule 60(b)(5))**: The pendency of the SOX whistleblower proceeding (OALJ Case No. 2025-SOX-00034) constitutes a significant legal change. Under Garmon abstention principles, this Court's continued interference with claims arguably subject to the primary jurisdiction of the DOL is inequitable.

**G. Extraordinary Circumstances (Rule 60(b)(6))**: The combination of a void judgment, a fraud upon the court, and the ongoing denial of any forum constitutes the kind of "extraordinary

circumstances" justifying relief under the catch-all provision. *Gonzalez v. Crosby,* 545 U.S. 524, 535 (2005). The Court's subsequent issuance of a filing injunction based on this void judgment only compounds the extraordinary injustice.

**V. The 2025 Complaints Plead New Claims Arising from New Facts, Barring the Application of Res Judicata.** The District Court's res judicata analysis collapses under scrutiny because it ignores the fundamental requirement of an "identity of the cause of action." *Barr v. Bd. of Trustees*, 796 F.3d 837, 840 (7th Cir. 2015). While both suits arise from the employment relationship, the 2025 Complaints are based on a new set of operative facts that were not in existence, and thus could not have been litigated, during the prior suit.

**A. The "New and Distinct" Claims in the 2025 Complaints.** The Court erroneously treated the 2025 Complaints as a mere re-pleading of the 2024 defamation and IIED claims. This is a mischaracterization. The 2025 Complaints introduce claims based on post-dismissal conduct, including: 1. Judicial SLAPP and Fraud on the Court (2025L007621): This complaint targets Defendants' conduct in the litigation of the first case and the alleged sabotage of Plaintiff's state court access through fraudulent removal and ultra vires acts by judicial defendants. These claims accrued after the April 30, 2025, dismissal of the first federal case. They concern the integrity of the judicial process itself, not the underlying termination. 2. New Defamatory Publications and Retaliatory Acts (1:25-cv-07099, particularly the First Amended Complaint): The First Amended Complaint specifically alleges new, post-dismissal publications and acts:

  · CCHR Filing (April 15, 2025): A defamatory position statement filed with the Cook County Commission on Human Rights after the first case was dismissed.

  · Ongoing Blacklisting (through July 2025): Allegations that the defendants continued to disseminate false statements to industry competitors well after the first case concluded, causing new and continuing harm.

· Fraudulent Concealment Discovered Post-Dismissal: The Complaints allege that metadata and other evidence, discovered after the dismissal of the first case, prove that key disciplinary records were backdated, constituting a new fraud claim that could not have been brought earlier.

**B. These New Claims Could Not Have Been Brought in the First Action.** The principle that res judicata bars claims that "could have been litigated" does not apply to claims that did not yet exist. See *Lawlor v. Nat'l Screen Serv. Corp*., 349 U.S. 322, 328 (1955) (res judicata does not bar a subsequent action based on "transactions occurring after the commencement of the prior action"). The District Court's own dismissal order in the first case noted Plaintiff failed to amend by April 25, 2025. The key defamatory CCHR filing, for example, did not occur until April 15, 2025, leaving a practical impossibility to amend meaningfully before the deadline. The litigation misconduct allegations occurred after the first case was closed. Therefore, the 2025 Complaints are based on a "new set of facts" creating separate and distinct claims. See *Czarniecki v. City of Chicago,* 633 F.3d 545, 550 (7th Cir. 2011).

**C. The Res Judicata Defense Fails as a Matter of Law.** Res judicata does not bar claims that were not ripe and could not have been litigated in a prior action. The test for claim preclusion requires a final judgment on the merits in a prior suit involving the same parties or their privies and the same cause of action. Here, the new 2025 complaint alleges harms—including the ongoing falsification of the court transcript on August 29, 2025—that occurred after the prior suits were filed. These are new causes of action. Furthermore, the prior judgment is not final, as a Petition for a Writ of Certiorari is pending (No. 25-5692). *Hurtt v. International Services, Inc*., 627 F.3d 1008, 1012 (5th Cir. 2010).

## VI. MULTIPLE, MANDATORY ABSTENTION DOCTRINES BAR THIS COURT'S INTERFERENCE.

This Court's continued action violates a suite of abstention doctrines:

· Garmon Abstention: Primary jurisdiction rests with the NLRB and DOL (SOX Case 2025-SOX-00034).

· Pullman/Beaufort Abstention: This case involves sensitive state law issues regarding the jurisdiction of the Cook County Circuit Court and Illinois administrative agencies, requiring deference to state court resolution. See *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Beaufort County v. United States Army Corps of Eng'rs*, 106 F.3d 422 (4th Cir. 1997) (abstention appropriate to avoid interference with complex state regulatory regimes). This case involves complex and unresolved issues of state law central to the Illinois Circuit Court's authority and Illinois's administrative scheme (CCHR, IDOL), requiring deference to state tribunals.

· Younger Abstention: This Court is enjoining ongoing state court proceedings.

· Rooker-Feldman Doctrine: This Court is reviewing a final state court judgment. This Court is acting as a de facto appellate court over the Cook County Circuit Court, which issued a final merits decision on June 25, 2025, a case now on appeal to the First District Illinois Appellate Court.

## VII. NEWLY DISCOVERED EVIDENCE OF FRAUD VITIATES THE JUDGMENT.

### A. The August 29, 2025, Falsified Transcript is Evidence of a Criminal Conspiracy.

The deliberate falsification of the official court transcript is newly discovered evidence of a fraud upon the court. This is not a privileged judicial act but a criminal, ministerial act undertaken in the clear absence of all jurisdiction. *Rankin v. Howard,* 633 F.2d 844, 849 (9th Cir. 1980); *Forrester v. White*, 484 U.S. 219, 229-30 (1988). This fraud proves the conspiracy alleged in the complaint and nullifies any claim of finality for res judicata purposes.

### B. September 8, 2025, SOX Disclosures Prove Ongoing Fraud and Waive Privilege.

Respondent's disclosures in the SOX proceeding constitute judicial admissions and a subject matter waiver under Federal Rule of Evidence 502, proving the blacklisting and fraud are

ongoing in 2025. These disclosures were not accidental; they are determinate negations of their position in this forum. The question is not if a conspiracy can be pleaded—as the USAO conceded it could be—but where. The answer, as *Huon v. Breaking Media* instructs, is state court for these "actionable user comments" distinct from any prior "article."

## VIII. THE FEDERAL OFFICER AND IMMUNITY DEFENSES ARE INAPPLICABLE AND ADMIT THE FACTS.

### A. The Test for Immunity is Not Met for Ultra Vires Criminal Acts.

Judicial immunity is lost when an officer acts in the "clear absence of all jurisdiction" or performs a non-judicial act. *Stump v. Sparkman,* 435 U.S. 349, 356-57 (1978). The alleged falsification of records is the quintessential non-judicial act. The test for immunity is a threshold question: if the alleged actions are, as pleaded, criminal and conspiratorial, then immunity is categorically unavailable. The defendants' own disclosures and the transcript fraud provide ample evidence that their actions were not "judicial."

### B. Defendants' Contradictory Positions Concede Jurisdiction. If defendants claim federal officer immunity, they admit the factual allegations of the complaint are true but assert a defense to liability. They are not immune from suit. If they remove under the federal officer removal statute, they concede this Court's jurisdiction is based on their status as federal officers, implicitly admitting the ultra vires acts alleged. In either scenario, they admit the core factual premise. The case turns on where the claims can be filed, not where defendants have the greatest tactical advantage. Actual malice has been pleaded, which defeats any qualified immunity defense.

## IX. THE STATE COURT IS THE PROPER AND CONVENIENT FORUM.

The Circuit Court of Cook County has already demonstrated its jurisdiction. Its June 25, 2025, dismissal of a related case was a merits-based ruling that allowed amendment, conceding

the claims were non-frivolous. Critically, the CCCC did not summarily dismiss the July 9, 2025, complaint against Defendants Tharp and Fitzgerald, signaling its intent to hear these very claims. This Court's filing injunction, under the reasoning of *Snap Inc. v. Brown*, is an improper denial of a state court remedy where a legal forum is willing and able to adjudicate the merits. As in *Snap*, a filing injunction is inappropriate where the targeted party has a legal remedy in another forum. Defendants do not seek to avoid frivolous litigation; they seek to avoid a state court merits judgment. Their fear of a state court jury is not a basis for federal injunctive relief.

This state court final judgment (7621)(09525) confirms that the claims are properly before the state system. This Court's attempt to issue a contrary, final ruling under Rule 54(b) is a nullity. The state court's active jurisdiction over the same subject matter makes remand not just appropriate, but mandatory.

## X. DEFENDANTS' CONTRADICTORY POSITIONS ADMIT THE FACTS AND CONCEDE JURISDICTION.

Defendants' arguments place them in an inescapable legal pickle:

· If they claim federal officer immunity, they admit the factual allegations of the complaint are true but assert a defense to liability. They are not immune from suit. See, e.g., *Rankin v. Howard*, 633 F.2d 844, 849 (9th Cir. 1980).

· If they remove under the federal officer removal statute, they concede this Court's jurisdiction is based on their status as federal officers, implicitly admitting the ultra vires acts alleged.

In either scenario, they admit the core factual premise of the complaint—that they acted under color of federal authority in committing the alleged torts. The only question is whether those acts were "judicial" (potentially immune) or "wholly outside" and criminal (not immune). This is a merits determination for the state court of original jurisdiction, not a basis for this Court to retain a case over which it has no SMJ.

**XI. THE "FRAUD" EXCEPTION TO NOERR-PENNINGTON DOCTRINE
APPLIES, AS THIS LITIGATION IS A SHAM.** The Defendants' removal of this action is an
objectively baseless use of the judicial process as an anti-competitive weapon. *California Motor
Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972). This is a judicial SLAPP
designed to exhaust and bankrupt a pro se litigant, not to secure a legitimate adjudication. See
Case 09520, *Pl. Emergency Mot*. at 11-12. This sham litigation is not protected petitioning
activity.

**XII. NEWLY DISCOVERED EVIDENCE PROVES FRAUD AND VITIATES RES
JUDICATA UNDER THE "IMPOSSIBILITY" DOCTRINE. A. Illinois Rule 502
Disclosures and Ongoing SOX Fraud.** The claims pleaded were impossible to bring earlier
because the fraud had not yet been discovered or committed. The Defendants' September 8,
2025, disclosures in the SOX proceeding (OALJ 2025-SOX-00034) constitute judicial
admissions and a subject matter waiver under Illinois Rule of Evidence 502 (and its federal
counterpart), proving the blacklisting and fraud are ongoing in 2025. See *9/11/25 Pl. SOX
Motion,* at 11, 22-24, 30. These Illinois evidentiary rules govern the state claims and are wholly
independent of LMRA preemption.

**B. The 501(c)(5) Entity's Financial Records and New SOX Disclosures Prove the Fraud is
Ongoing.** New evidence proves the alleged 2023 grievance, the foundation of the LMRA
preemption argument, could not have occurred. The financial and operational structure of the
501(c)(5) entity shows no mechanism for such a grievance proceeding existed at the time. This is
fraud. Furthermore, Respondent's disclosures in the ongoing SOX proceeding (OALJ 2025-
SOX-00034) on September 8, 2025, constitute a judicial admission and subject matter waiver
under FRE 502. See *SOX Motion* at 11, 22-24, 30. Counsel admitted that the blacklisting and
fraudulent conduct are ongoing in 2025, directly contradicting the argument that this case is

barred by 2023 res judicata. Claims based on post-filing harms are not barred. See *Emergency Mot*. at 7-8 ("Res Judicata Does Not Bar Claims Based on Post-Filing Harms").

This ongoing fraud vitiates everything. The judgment, based on a fraudulent premise, cannot stand.

**C. The Falsified Transcript and Ultra Vires Conspiracy.** The August 29, 2025, transcript falsification is newly discovered evidence of a criminal conspiracy. This is not a mere due process violation appealable within the system; it is a wholly outside act undertaken in the clear absence of all jurisdiction. The distinction is critical: Due process violations are legal errors; ultra vires criminal acts are intentional torts. *Rankin v. Howard*, 633 F.2d 844, 849 (9th Cir. 1980): A judge who acts as a conspirator in a scheme to predetermine a case's outcome "acts in the clear absence of jurisdiction and is not immune."

*Forrester v. White*, 484 U.S. 219, 229-30 (1988): Immunity does not extend to administrative or ministerial functions, such as falsifying a public record. This conspiracy to usurp power from the CCHR, NLRB, and OSHA SOX—agencies financed by taxpayer dollars—defrauds those programs of their ability to render merits decisions. This Court's dismissal was not a final judgment on the merits under Rule 54(b) but an unlawful kick-out of claims properly before other tribunals.

The dismissal of the time-barred LMRA claim in the prior case (1:24-cv-09900) eliminated the sole basis for federal preemption. See *Pl. Emergency Mot.* at 6-7 (arguing "The Dismissed LMRA Claim = The Substantially True Article… The federal court's dismissal… removed the only basis for federal preemption."). The LMRA 'kicked out' when this Court dismissed 09900, leaving only non-preempted state claims. This Court's refusal to remand and its insistence on probing the merits of state claims in a void case is itself a malicious act. See 09520, *Pl. Emergency Mot*. at 2, 5 (citing *Rankin v. Howard,* 633 F.2d 844, 849 (9th Cir. 1980)

for the principle that a conspiracy to manipulate judicial outcomes is actionable, and that actions in clear absence of jurisdiction are not immune).

## XIII. THE CLAIMS ARE FOR VIOLATIONS OF ILLINOIS PUBLIC POLICY, NOT FEDERAL DUE PROCESS.

This is not a Bivens action for due process violations. The question is not whether officers violated due process, but whether they violated the criminal tort policy of Illinois. The cause of action arises from the precedent of the Supreme Court in *Rankin* and *Forrester*, which permits suits for personal injury caused by ministerial, ultra vires, and criminal acts. The intentional infliction of emotional distress ("IIED") alleged here is a violation of Illinois public policy, distinct from a procedural due process error.

## XIV. THE DIVESTITURE DOCTRINE PRECLUDES THIS COURT'S JURISDICTION.

This Court's jurisdiction is divested by pending appeals. *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) ("A notice of appeal . . . divests the district court of its control over those aspects of the case involved in the appeal."). See Emergency Mot. at 21, n.13. The pending Petition for a Writ of Certiorari in the Supreme Court (No. 25-5692) and appeals in the Seventh Circuit further demonstrate that the prior judgment is not final for res judicata purposes. See Emergency Mot. at 19-20 (citing *Hurtt v. International Services*, Inc., 627 F.3d 1008, 1012 (5th Cir. 2010)).

**CONCLUSION** The Court's Judgment is void for lack of subject matter jurisdiction. The claims in the 2025 Complaints are new, non-preempted state-law claims over which this Court has no power. The filing injunction is an ultra vires act that compounds this jurisdictional error. The res judicata defense is nullified by newly discovered evidence of an ongoing criminal conspiracy to falsify records and commit fraud. The USAO in *Szmurlo v. Tharp I* explicitly noted a properly pleaded conspiracy claim would not be immune, mirroring the unfulfilled promise in *Maxwell v.*

*U.S.* This Motion is necessary to create a record of this Court's criminal conspiracy to probe protected activity and plead a pro se litigant out of court.

This is not a "second bite at the same apple." It is a new bite at a new apple—a 2025 fraud admitted by Defendants themselves. The Court's jurisdiction is determined by the four corners of the Complaint, which allege no federal issue. The subsequent discovery of fraud and the existence of parallel state and agency proceedings make the Judgment void and the injunction unlawful.

**WHEREFORE,** Plaintiff Pete Szmurlo respectfully requests that this Court: 1. Grant this Motion pursuant to Rules 59(e) and 60(b)(4) and (6); 2. Vacate the Void Judgment (ECF No. 53) and the Void Sanctions Order (ECF No. 54); Vacate the Void Judgment of Dismissal and the Void Filing Injunction; 3. Immediately remand this action to the Circuit Court of Cook County, Illinois; 4. Award Plaintiff costs and fees incurred due to this frivolous removal; and 5. Grant Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Pete Szmurlo Pete Szmurlo, Pro Se 7951 Calumet Avenue, #1142 Munster, Indiana 46321

(219) 544-1724 peterszmurlo@gmail.com Dated: September 24, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of September, 2025, I electronically filed the foregoing with the Clerk of the Court using the BOXPDFsystem. Also sent motion via email to all counsel of record. /s/ Pete Szmurlo Pete Szmurlo

# Exhibit A

Case: 1:25-cv-07099 Document #: 57 Filed: 09/24/25 Page 22 of 122 PageID #:1802
Case: 25-1941    Document: 42    Filed: 09/08/2025    U.S.C.A. - 7th Circuit
RECEIVED

SEP 0 8 2025

**Case No.: 25-1941**

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

**Pete Szmurlo,** *Plaintiff-Appellant,* **v. TK Elevator Corp., et al.,** *Defendants-Appellees.*

**Caption: Pete Szmurlo,** *Plaintiff v* **TK Elevator Corp, International Union of Elevator Constructors Local 2 Chicago, National Elevator Industry Educational Program, Joint Apprenticeship Committee of Local 2 Chicago, Kone Elevator, Schindler Elevator, Otis Elevator** *Defendants.*

**TITLE: <u>APPELLANT'S EMERGENCY MOTION TO COMPEL CERTIFICATION OF THE RECORD AND TO SUPPLEMENT THE RECORD ON APPEAL</u>**

**9/5/2025 by Plaintiff- Appellant Pro Se**

**Pete Szmurlo, 7951 Calumet Ave. #1142, Munster IN 46321 2195441724**

Appellant Pete Szmurlo, proceeding pro se, respectfully moves this Court, pursuant to Federal Rule of Appellate Procedure 10(e) and 28 U.S.C. § 753(b), for second time for an order compelling the official court reporter for the Northern District of Illinois to certify and correct the transcript of the November 21, 2024, proceedings and to supplement the record on appeal with the original audio and video recordings. This motion is necessary due to the court reporter's provision of

a materially falsified and incomplete transcript, which omits critical judicial statements and party admissions, thus poisoning the integrity of the record on appeal.

1. INTRODUCTION The official transcript provided by Court Reporter Kelly Fitzgerald on August 30, 2025, is not a verbatim account of the proceedings. It omits multiple material statements that are crucial to the issues on appeal, including judicial acknowledgments of criminal conduct and appellee's admissions to violating Illinois eavesdropping law. These omissions were made knowingly and with actual malice, constituting a fraud on this Court and irreparably harming Appellant's ability to prosecute this appeal.

2. LEGAL STANDARD Fed. R. App. P. 10(e)(2) empowers this Court to correct or modify the record to ensure its accuracy "if anything material to either party is omitted from or misstated in the record by error or accident." This power is broad and includes compelling a court reporter to perform their non-discretionary, ministerial duty under 28 U.S.C. § 753(b) to "record verbatim" and produce an accurate transcript.

3. STATEMENT OF FACTS The provided transcript omits, inter alia, the following material statements: a. Judge Tharp's statement: "That's not a violation of your 4th amendment, that's criminal." b. Appellee's counsel's admission: "We recorded with one party consent," in the context of surreptitious recording at a school. c. Appellant's immediate response: "D. Kays just admitted to recording

without consent at school." d. Judge Tharp's statement expressing disregard for

Illinois law: "I never heard of Illinois eavesdropping law and I didn't take the time

to look it up before this hearing either."

These omissions are not accidental. They are intentional alterations that

conceal evidence central to Appellant's claims and have been relied upon by the

district court to issue erroneous rulings.

4. ARGUMENT The court reporter has failed her ministerial duty. The omissions

are so material that the current transcript is near nullity. Without an accurate

record, this Court cannot fairly adjudicate the appeal. The only remedy is to

compel the production of the original audio and video recordings to certify a true

and correct record. The impossibility of relying on the official record forces

Appellant to rely on contemporaneous notes, which consistently document these

omissions.


5. RELIEF REQUESTED Appellant respectfully requests this Court order: a.

Court Reporter Kelly Fitzgerald to immediately produce the original, unaltered

audio and video recordings of the November 21, 2024, hearing for certification. b.

The supplementation of the record on appeal with the certified, corrected transcript

and the original recordings. c. Any other relief this Court deems just and proper.

Respectfully submitted, September 5, 2025

/s/ Pete Szmurlo

**Pete Szmurlo, Pro Se**

7951 Calumet Ave. #1142

Munster, IN 46321

(219) 544-1724

peterszmurlo@gmail.com


CERTIFICATE OF SERVICE I, Pete Szmurlo, hereby certify that on September 5, 2025, I mail filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the USPS system, which will send notification of such filing to all counsel of record. I emailed a copy of this motion to all record of counsel, and personally emailed Kelly Fitzgerald a copy.


/s/ Pete Szmurlo

# Exhibit C

Case No.: 25-1941

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

**Pete Szmurlo,** *Plaintiff-Appellant,* **v. TK Elevator Corp., et al.,** *Defendants-Appellees.*

**Caption: Pete Szmurlo,** *Plaintiff v* **TK Elevator Corp, International Union of Elevator Constructors Local 2 Chicago, National Elevator Industry Educational Program, Joint Apprenticeship Committee of Local 2 Chicago, Kone Elevator, Schindler Elevator, Otis Elevator** *Defendants.*

## TITLE: EMERGENCY MOTION FOR LEAVE TO FILE RULE 60(a) MOTION IN DISTRICT COURT AND FOR EXTENSION OF TIME TO FILE APPELLANT'S BRIEF

**9/5/2025 by Plaintiff- Appellant Pro Se**

**Pete Szmurlo, 7951 Calumet Ave. #1142, Munster IN 46321 2195441724**

Now comes Appellant, Pete Szmurlo, pro se, and respectfully moves this Court for two forms of emergency relief:

U.S.C.A. — 7th Circuit
RECEIVED
SEP 08 2025

1. For leave to file a motion under Federal Rule of Civil Procedure 60(a) in the United States District Court for the Northern District of Illinois to correct a fraudulently altered transcript.

2. For a 30-day extension of time to file his appellant's brief, currently due September 8, 2025.

In support of this Motion, Appellant states as follows:

### INTRODUCTION AND GROUNDS FOR MOTION

1. This Motion arises from a profound and intentional corruption of the record on appeal. The official transcript of the November 21, 2024, hearing, provided by Court Reporter Kelly Fitzgerald on August 29, 2025, is not a verbatim account. It has been materially falsified to omit critical judicial statements and party admissions that are central to the issues on appeal, including jurisdictional questions, judicial bias, and the merits of underlying state law claims.

2. Appellant's brief, due September 8, 2025, cannot be finalized in good faith without an accurate record. The provided transcript is a nullity. Appellant must first seek to correct the record in the district court under Rule 60(a), for which he requires this Court's leave, and then be granted time to incorporate the true record into his brief.

### STATEMENT OF FACTS

1. On August 29, 2025, nine months after the hearing and only days before Appellant's brief was due, the court reporter provided the long-delayed transcript.

2. Upon immediate review, Appellant discovered the transcript is rife with material, intentional omissions designed to poison his appeal. The omissions include, but are not limited to: a. Judge Tharp's statement: "That's not a violation of your 4th amendment, that's criminal." (Omitted). b. Appellee's counsel's admission: "We recorded with one party consent." (Omitted). c. Appellant's immediate response: "D. Kays just admitted to recording without consent at school." (Omitted). d. Judge Tharp's statement expressing disregard for Illinois law: "I never heard of Illinois eavesdropping law and I didn't take the time to look it up before this hearing either." (Omitted).

3. These are not accidental errors. They are intentional alterations that conceal evidence of judicial misconduct, criminal eavesdropping admissions, and the district court's disregard for state law—the very basis of Appellant's challenge to subject matter jurisdiction and the merits of his appeal.

4. On September 5, 2025, Appellant provided the court reporter with formal, detailed notice of these falsifications and demanded correction. (See Exhibit A, Letter to Kelly Fitzgerald). The reporter has not complied.

5. Appellant has also filed an Emergency Motion to Compel Certification of the Record in this Court. See Exhibit B, Transcript attached by reporter.


**ARGUMENT**

**I. Leave to File a Rule 60(a) Motion is Necessary and Proper.**

1. Fed. R. App. P. 10(e)(1) provides that "If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly." This Court requires leave to file such a motion in the district court while an appeal is pending.

2. The standard for Rule 60(a) is met. The rule permits the correction of "a clerical mistake or a mistake arising from oversight or omission" in the record. The wholesale omission of entire, material statements from a transcript is precisely the type of "mistake arising from oversight or omission" the rule is designed to correct, especially when that "oversight" is allegedly intentional and fraudulent.

3. The freshness of Appellant's memory, corroborated by his contemporaneous notes and filings made the day of the hearing, provides a clear basis for the district court to settle this difference. The requested leave is the necessary first step to restore integrity to the record.

**II. An Extension of Time is Essential for Justice.**

1. Appellant's brief is due on September 8, 2025. It is impossible to file a brief that relies on a fraudulent record. Appellant must: a. Obtain this Court's leave. b. File the Rule 60(a) motion in the district court. c. Await the district court's ruling and the production of a certified, corrected transcript. d. Revise his brief to argue based on the actual proceedings.

2. Appellant could not have foreseen that the long-delayed transcript would be a falsified document. This constitutes "good cause" for an extension under Fed. R. App. P. 26(b).

3. The Motion to Compel(concurrently filed today) asks the Appellate Court to directly order the court reporter to act and to supplement the record itself. This is a direct attack.

4. This Motion for Leave (here) asks the Appellate Court for permission to go back to the District Court to have that judge settle the dispute under Rule 60(a). This is an alternative, procedural path. Even if the Court hasn't ruled by September 8th, Appellant will have a pending motion for an extension, which is the proper procedure.

**RELIE REQUESTED**

Appellant respectfully requests this Court:

1. GRANT leave to file a motion under Fed. R. Civ. P. 60(a) in the district court to correct the record of the November 21, 2024, proceedings.

2. GRANT a 30-day extension of time, until October 6, 2025, to file his appellant's brief.

3. Grant any other relief this Court deems just and proper.

Respectfully submitted, September 5, 2025

/s/ Pete Szmurlo

**Pete Szmurlo, Pro Se**

7951 Calumet Ave. #1142

Munster, IN 46321

(219) 544-1724

peterszmurlo@gmail.com

CERTIFICATE OF SERVICE

    I, Pete Szmurlo, hereby certify that on September 5, 2025, I mail filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the USPS system, which will send notification of such filing to all counsel of record. I emailed a copy of this motion to all record of counsel, and personally emailed Kelly Fitzgerald a copy.

/s/ Pete Szmurlo

# Exhibit A

To: Kelly Fitzgerald, Public ILND Court reporter Date: 9/5/25 From: Pete Szmurlo

Dear Ms. Fitzgerald,

     This correspondence serves as formal notice, pursuant to our ethical obligations and the rules of discovery, of newly discovered evidence that directly pertains to the claims in that lawsuit. I am writing to formally address the transcript of the November 21, 2024 proceedings before Judge Tharp, which you provided on August 29, 2025. As an aspiring lawyer, my ability to seek redress for what transpired in these proceedings is not merely a personal matter but a test case for the system's integrity. If the official record can be altered with impunity to conceal judicial statements and party admissions, the fundamental right to a meaningful appeal is eviscerated. This conduct has caused me severe direct and irreparable harm by undermining my appeal, my legal aspirations and my ability to seek redress, and diminishing my faith in the legal institution I aspire to join.

     However, upon preliminary review I must bring to your attention several critical material omissions and falsifications that fundamentally alter the legal meaning of the proceedings and directly impact my appeal currently pending before the Seventh Circuit Court of Appeals and scotus (Case No. 25-1941, Docket No. 09900), identified material omissions that render the transcript inaccurate and fraudulent. The brief will argue that the District Court's dismissal 4/4/25—first via a TRO transcript on 11/21/24 and subsequently on unlawful orders and Rule 52 grounds[1]—was a manifest error given the lack of jurisdiction and the court's refusal to consider the protected nature of my speech under Fed/Illinois rule 502, Illinois eavesdropping, IPRRA, defamatory, or anti-SLAPP principles. [2]

---

[1] Rule 52 a (2) *For an Interlocutory Injunction.* In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

[2] Slapp cpa gives the benefit of the doubt to the defendants in a defamation case, they forfeited the right to claim pleading is frivolous. They later raise MTD with defenses to state law, that inn-accurate pleading is the basis his claims should be dismissed, not preemption. They further contend plaintiff didn't exhaust his title VII rights, but irrelevant since plaintiff claims are state law claims and no smj of lmra or ancillary jurisdiction. Defendants 9/11/23 under Illinois 502 and 9/19/23 under FRE 502 admitted subject matter waiver doctrine "no grievance filed" but now sham removing tying CBA counterclaims with plaintiffs state law complaints, as their defense, and no federal jurisdiction on face of clear state law complaint, court erred refusing evidence rule 502 and subject matter waiver discussed in Remand Motion and attached complaint exhibit OSHA filing 9/19/23. The court alleges ab initio to OSHA immunity, factual or legal pleading of failure to state claim but removed case for jurisdictional finding purposes. Illinois claims require claims in county court as a statutory right the judge has no original jurisdiction and the removal statute is void, and defendants threats 7/14/25 to drop appeals or face their sham removals on any claim is unlawful litigation, disability and financial harassment, threats, and intent to deprivation of cccc final orders and fee waivers. Plaintiff emailed Defendants to correct their contradictory oaths, which Defendants uploaded to public records in 07099, to detriment of their own malfeasance and SMJ waiver doctrine under IL rule 502 and 804,805,806, 808, due to CCHR and Illinois IDOL agency falsified oaths discussed state law, federal question SMJ was waived.

1 of 16

My IFP status and the court's waiver of fees do not permit you to provide a falsified product. On August 29, 2025, you transmitted to my client pro se the transcript of the proceedings before Judge Tharp on November 21, 2024, prepared pursuant to the Court's June 25, 2025, IFP order granting transcript motion from 6/5/25, 21 days later decision, first IFP request 10/31/24 and transcript request was 2024, some 9 months later with pending appeal and cert petition without IFP or transcript.

The claims, involving whistleblower activities and public discussions on safety compliance and statutory lawfulness, are precisely the type of protected activity that statutes like New Jersey's UPEPA (as reinforced in Satz v. Starr )[3] and the need identified in South Carolina's "Big John" case are designed to shield from litigious retaliation. The defendants' knowingly false statements are to negatively affect the outcome of proceedings represent a perversion of the judicial process.

I documented these statements in filings made when my memory was fresh, creating judicial estoppel against this fraudulent transcript. This production constitutes a new publication of falsified statements and confirms the essential allegations of our complaint regarding the obstruction of justice and the refusal of access to accurate court records. The provided transcript fails to accurately reflect multiple statements made by both the presiding judge and the parties during the proceedings. This transcript contains material omissions and inaccuracies that misrepresent the hearing and undermine the integrity of the judicial record. Below, I outline the specific discrepancies and the resulting harms. The material omissions include, but are not limited to:

1. Omission of Judge Tharp's Statement: Tr. at 6, 9-15

During the hearing, Judge Tharp explicitly stated, "That's not a violation of your 4th amendment, that's criminal." This statement is absent from the transcript. This remark is crucial as it relates to the core constitutional issue of warrantless recordings and the criminal nature of the alleged eavesdropping, a central element of my appeal. [4] The Allegation: A judge stating

---

[3] The case began when Allen J. Satz filed a $30 million lawsuit against the Organization for the Resolution of Agunot (ORA), The Jewish Link, Bies Medrash of Bergenfield, Keshet Starr, and Rabbi Neal Turk—after they circulated a flyer urging him to grant his wife a "get" or Jewish religious divorce. The flyer included Satz's photo and called for a protest outside his parents' home. Satz later voluntarily dismissed the lawsuit, but the defendants sought to recover legal fees under the UPEPA. The trial court denied their motion, but the Appellate Division reversed that decision, holding that the defendants were entitled to pursue their claim for attorney's fees and costs under the Anti-SLAPP statute—even after the case was dismissed. This ruling is a significant affirmation of the UPEPA's purpose: to deter Strategic Lawsuits Against Public Participation (SLAPP) and protect individuals and organizations from being silenced through costly litigation...The Satz decision is the first published appellate opinion interpreting New Jersey's Anti-SLAPP law. It sends a clear message: New Jersey courts will not tolerate attempts to chill free expression through litigation. For individuals, media outlets, and advocacy organizations, this ruling offers reassurance that speaking out on matters of public concern is not only a right—but one that is now firmly protected by law. https://www.kemenylaw.com/post/new-jersey-appellate-court-upholds-anti-slapp-protections-in-case-involving-a-dispute-over-man-s-ref

[4] The plaintiffs reports discussed an interactive process for accommodation and asme standards and licensing requirements of following manufacturer requirements aside IL drivers license laws and CDL as public concerns, and his petitions relief for privacy, IIED, hate crimes, harassment, and or IPRRA

"that's not a violation of your 4th amendment that's criminal" and then having that statement omitted from the transcript is an allegation of evidence tampering. The Legal Theory: While judges have absolute immunity for judicial acts, they have no immunity for non-judicial acts. Fabricating evidence is not a judicial act; it is a criminal act red handed eavesdropping. By engaging in such conduct, the argument goes, the judge waived any claim to immunity for that specific act. The same applies to the court reporter. Documented in various motions, see ECF 70, Pl. Supplmental Authority, "The court determined a 4th amendment violation is criminal, and plaintiff concurs." PageID 612.

2. Omission of Defendant's Admission: Tr. At 17,18, 18-8

The defendant, dkays, admitted to "recording with one party consent." This critical admission is omitted from the transcript. Documented in ECF 67, Pl. Mo. Reconsideration, "Defendants admit they hold one party consent, not 2." PageID607

3. Omission of My Response: Tr. At 22, 1-20

I immediately stated, "dkays just admitted to recording without consent." This response is also missing from the transcript. These 1&2&3# omissions conceal critical evidence regarding the illicit nature of the surreptitious recordings without consent, which form the basis of my Illinois Eavesdropping Act and or Illinois Personal Records Review Act (IPRRA) or any other violation of state law claim.

4. Omission of judge Tharp: "you can't sue them for defamation at OSHA or Cchr" (Perjury doesn't matter). Tr. At 23, 2-3. Documented in ECF 75, Pl. Pre. Inj., PageID 626.


5. Additional Discrepancies: Other inaccuracies, not fully detailed here, will be identified upon review of the original audio and or video recording. Furthermore, the transcript's indicated timeframe (11:06 a.m. to 12:07 p.m.) is inaccurate and omits approximately six minutes of the proceeding, which I witnessed firsthand. Documented "never heard of IL eavesdropping law" in ECF 67, PageID 609. "The court determined it did not know Illinois Eavesdropping Law, and there for incorrectly applied it to the defendant-sided order."


    This transcript was prepared in forma pauperis (ifp) for the specific purpose of my appeal. The accuracy of the record is paramount as I am relying on the aforementioned statements to demonstrate that the District Court:

· Manifestly erred in applying res judicata to a case dismissed for procedural lapses want of prosecution and lack of jurisdiction, and no convenient forum for all claims, general jurisdiction

---

retaliation under the law are not effected by a cba claim interpretation, as felony the removal statute is violated for each claim. If for some unknown reason, Defendant's LMRA should be permitted despite total irrelevance to the main action, they would properly be subject to all the jurisdictional requirements which would be applicable were they prosecuted as independent actions. E.g., Childress v. Cook, 245 F.2d 798, 803 (5th Cir. 1957); Foster v. Brown, 22 F.R.D. 471, 473 (D.Md. 1958). In one case it was stated that the rules broaden the content of an action rather than extend federal power. Lesnik v. Public Industrials Corp., 144 F.2d 968, 973 (2d Cir. 1944).

claims.

· Ignored critical admissions and evidence that support my claims of eavesdropping, defamation, IIED, and violations of IPRRA.

· Violated established jurisdictional principles under the Rooker-Feldman doctrine [5], Younger abstention, and Garmon preemption, given that the IHRA[6] charges were filed prior to the federal sham removal suit and involved matters of public policy beyond a mere CBA dispute.[7]

The freshness of my memory at the time of the hearing, corroborated by my earlier filings made contemporaneously with the proceedings, stands in stark contrast to the fabricated transcript now provided.

Pattern of Obstruction: You initially refused to produce the transcript, falsely claiming no fee waivers were accepted in 2024. The court granted my in forma pauperis motion on June 25, 2025, yet you failed to produce the transcript promptly. On July 31-August 1, 2025, you instructed me to submit a new order, further delaying access.

The omissions and delays have caused me significant harm, including interference with my ability to pursue my appeal and my pending case in the Circuit Court of Cook County. As a journalist, I rely on accurate records to protect my reputation and my rights under Illinois tort law, including claims related to defamation and interference with economic advantage.

Your actions go beyond negligence and enter the realm of intentional misconduct. You

---

[5] Antoine (pro se) filed suit U.S. District Court, N.D. Ala., against the judges who ruled against her. Eleventh Circuit held that "Antoine's claims against the Alabama judges fall into the narrow heartland of the Rooker-Feldman doctrine." Antoine v. Verin, 746 F. App'x 802, 804 (11th Cir. 2018). https://lanierford.com/images/NewsPDFs/Federal-Abstention-Doctrines.pdf

[6] •Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976). •Federal court dismissal appropriate when: •a parallel proceeding is occurring in state court, and •exceptional circumstances are present. AAL USA, Inc. v. Black Hall, LLC, 2017 WL 2349546, at *3 (N.D. Ala. 2017).

[7] 6. Defendant argue *miller*, his claims are preempted under the Labor Management Relations Act (the "LMRA") because they are inextricably intertwined with the collective bargaining agreement. See Szmurlo, Case No. 1:24-cv-09900, Dkt. 108, Order Denying Mot. to Remand (Feb. 4, 2025); see also 29 U.S.C. § 185(a); Miller v. Sw. Airlines Co., 926 F.3d 898, 903 (7th Cir. 2019) (under both the LMRA and the Railway Labor Act, "if a dispute necessarily entails the interpretation or administration of a collective bargaining agreement, there's no room for individual employees to sue under state law"); see also Gray v. Univ. of Chicago Med. Ctr., Inc., No. 19-CV-04229, 2020 WL 1445608, at *3–5 (N.D. Ill. Mar. 25, 2020) (quoting Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 260 (1994)) ("The rule and reasoning of Miller apply to the LMRA because the RLA preemption standard is 'virtually identical to the pre-emption standard the Court employs in cases involving § 301 of the LMRA.'"); Peatry v. Bimbo Bakeries USA, Inc., No. 19C2942, 2020 WL 919202, at *3 (N.D. Ill. Feb. 26, 2020) (same); see generally Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 408–409 (1988) ("§ 301 [of the LMRA] pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements"). In turn, this means that TK Elevator is "entitled to remove the suit to federal court under the federal-question jurisdiction," regardless of whether Plaintiff "attempted to frame a complaint relying entirely on state law." Miller, 926 F.3d at 904–905.

initially misled me in 2024 by falsely stating that no waivers were accepted for transcript fees and Zelle or Venmo only but have a closed bank account causing critical delay. The Court granted my in forma pauperis (IFP) motion and ordered the transcript at government expense on June 25, 2025. This order was directed to you, imposing a ministerial duty to produce the transcript.

You failed to follow that court order. Instead, on July 31, 2025, you instructed me to submit a new order, falsely claiming the original from November 2024 was "filled" because it "wasn't paid," despite the IFP waiver being in place. The court failed its supervisory ministerial duty to ensure you complied with its June 25 order and passed the responsibility to me, an indigent plaintiff for whom a reprint was impossible. This stands in stark contrast to the efficient, honest process in the Circuit Court of Cook County. Your conduct, in concert with the court's failure to supervise, represents a clear pattern of obstruction designed to suppress my participation in judicial processes. This is a quintessential example of the abuse that Illinois's strengthened anti-SLAPP laws are designed to combat, protecting citizens from strategic litigation and procedural manipulation intended to silence their exercise of petitioning rights.[8]

This conduct is unacceptable. It violates the fundamental public policy of Illinois, which values transparency, accountability, and the protection of its citizens from abusive legal tactics. Last week Governor JB Pritzker signed Senate Bill 1181 into law, clarifying that the protections in the Citizen Participation Act apply to the freedom of the press to opine, report, or investigate matters of public concern. [9]

These are not minor errors. They are material omissions that alter the entire legal character of the proceedings. This falsification is a new, independent publication of fraudulent statements. This transcript is materially falsified and constitutes a severe breach of your ministerial duty to produce an honest and accurate record of public proceedings.[10]

---

[8] Burford v. Sun Oil Co., 319 U.S. 315 (1943). • Burford-type abstention . . . . is premised on a belief that in particular areas of the law any intervention by the federal court would have an impermissibly disruptive effect on state policies. 17A Fed. Prac. & Proc. Juris. § 4245 (3d ed.) • A similar abstention doctrine exists by the name of Thibodaux abstention, named for Louisiana Power & Light v. Thibodaux, 300 U.S. 25 (1959) (where matters "normally turn on legislation with much local variation interpreted in local settings," it was proper for federal courts to defer to state courts "in a matter close to the political interests of a State" in the interests of "harmonious federal-state relations.").

[9] Id. There had been a history of Federal courts interpreting Texas law: "These federal court decisions on state law have created a constant task for the Texas Governor, the Texas legislature, and the Railroad Commission." Court held that Texas had fully developed a thorough system of review of RRC decisions and that repeated federal decisions on similar issues was interfering with orderly administration of state system. https://lanierford.com/images/NewsPDFs/Federal-Abstention-Doctrines.pdf

[10] Younger v. Harris, 401 U.S. 37 (1971). • Recognizes the general rule that a federal court should not enjoin criminal prosecution in state court except under unusual circumstances. "[T]he possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it, and . . appellee Harris has failed to make any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief.

By fabricating the official record, [11] you and the court have engaged in an anti trust Pennington-type fraud on the process, surreptitiously recording oral transmissions, where the machinery of justice is weaponized to prevent the exposure of truth and to shield misconduct from accountability. These omissions were knowingly made with actual malice and have irreparably harmed my ability to pursue injunctive relief against eavesdropping and IPRRA violations, as well as my petition for certiorari to the U.S. Supreme Court. This fraud destroys any claim to privilege and demands negative accountability for the harm caused to an Illinois litigant. [12]

They are material alterations that go to the heart of the underlying claims of eavesdropping and the need for accurate records for appellate review.[13] This conduct forms the basis of our claims for:

· Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) (815 ILCS 505/1 et seq.): The provision of a falsified transcript to an indigent consumer, by an entity with a monopoly on the product, constitutes an unfair and deceptive act.

· Violation of the Illinois Anti-SLAPP Act (735 ILCS 110/1 et seq.): The act of falsifying the record is a form of judicial SLAPP conduct—it is a strategic litigation against public participation aimed at suppressing my client's petitioning rights by sabotaging his appeal and his ability to prove his claims in the Cook County case[14].

· Obstruction of Justice and Intentional Spoliation of Evidence: The production of a falsified

---

[11] Where a person about to be prosecuted in a state court can show that he will suffer irreparable damages unless the proceeding in the state court is enjoined. Ex parte Young, 209 U.S. 123 (1908). Younger has been extended to federal suits seeking only declaratory relief. Samuels v. Mackell, 401 U.S. 66, 69 (1971).

[12] "We applied the test set out in 31 Foster Children v. Bush, 329 F.3d 1255, 1274 (11th Cir. 2003): • Proceedings constitute an ongoing state judicial proceeding • Proceedings implicate important state interests • There is adequate opportunity in the state proceedings to raise constitutional challenges" Noted that Huffman v. Pursue Ltd., 420 U.S. 592 (1975) provides that "Younger standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies."

[13] •"Matters involving domestic relations and child custody implicate important state interests," to the same extent as criminal matters. Davis v. Self, 547 F. App'x 927, 930 (11th Cir. 2013). •"Whether a claim would likely be successful on the merits in the state court is not what matters. Instead, what matters is whether the plaintiff is procedurally prevented from raising his constitutional claims in the state courts." Davis v. Self, 547 F. App'x 927, 931 (11th Cir. 2013).

[14] Six factor test • whether one of the courts has assumed jurisdiction over property • the inconvenience of the federal forum • the potential for piecemeal litigation • the order in which the fora obtained jurisdiction • whether state or federal law will be applied • the adequacy of the state court to protect the parties' rights. 1320, 1331 (11th Cir. 2004) Ambrosia Coal & Const. Co. v. Pages Morales, 368 F.3d. (U.S. Supreme Court then went on to establish a "new" abstention doctrine applicable to cases of concurrent jurisdiction. Three factors identified (later expanded to the six factors set out above): 1. Inconvenience of Federal forum. 2. Desirability of avoiding piecemeal litigation. 3. Order in which jurisdiction was obtained by courts involved.) https://lanierford.com/images/NewsPDFs/Federal-Abstention-Doctrines.pdf at 62-71

official record is a direct obstruction of the administration of justice or any other violation of state law & will seek all appropriate remedies and sanctions at law and in equity.[15]
Your actions constitute:
· Illinois Computer Fraud and Abuse: Intentional manipulation of a digital court record.
· Antitrust Activity: Abuse of the court's monopoly over transcript production to provide a falsified product to an indigent litigant.
· Tortious Interference: Deliberate obstruction of my judicial proceedings and reputation.
· Impossibility Doctrine: Your conduct has made it impossible for me to rely on the official record, forcing me to use my contemporaneous notes and filings as evidence.

The harms are irreparable and include:
· Damage to my journalism and privacy, which are now valued less than my peers' due to the falsified record.
· Humiliation and reputational harm, as the omissions make me appear dishonest or mistaken.
· Obstruction of my petitioning rights, as the transcript falsifies matters of public concern regarding judicial misconduct.
       This letter also serves as a formal demand that you and the District Court immediately take all necessary steps to preserve the original audio and video recording of the November 21, 2024, hearing. The destruction or alteration of this audio and video evidence would constitute severe spoliation and warrant the strongest sanctions.
       Pursuant to Federal Rule of Appellate Procedure 10(e) and the Northern District of Illinois' Local Rule 83.13 regarding the duties of court reporters, I hereby formally demand that you:

1. Immediately certify in writing the specific errors and omissions detailed in this letter.
2. Prepare and provide a corrected, certified transcript that includes all the omitted statements within five (5) business days.
3. Provide a detailed explanation for the reasons behind these material omissions.

4. Produce the original audio and video recording of the November 21, 2024 hearing for verification.

---

[15] "We do not know for certain that these procedures . . . will be available to Justice See. But, in the interest of comity and federalism, we err—if we err at all—on the side of abstaining." Butler v. Alabama Judicial Inquiry Comm'n , 261 F.3d 1154, 1159 (11th Cir. 2001) •In other words, Eleventh Circuit held that if there is any reasonable possibility that an issue could be raised before a state court, Younger applies. https://lanierford.com/images/NewsPDFs/Federal-Abstention-Doctrines.pdf

This newly discovered evidence of transcript falsification confirms the validity of the existing claims in the Circuit Court of Cook County. I reserve all my rights regarding this matter.[16] [17] [18] [19]

The standards for injunctive relief are met here: The remedy at law is inadequate.

· Irreparable Harm: The falsified record undermines my pending appeals, petitions, and state court actions.
· Inadequate Remedy at Law: Monetary damages cannot cure the loss of trust in the judicial record or the reputational harm.
· Likelihood of Success: The omissions are proven by my contemporaneous notes and prior filings.
· Public Interest: Ensuring the accuracy of court records is essential to judicial integrity.

Conclusion - This coercion and the suppression of my protected activity during the hearing are the subject of my petitioning on matters of public concern: judicial misconduct and falsified journalism by the ILND. I have documented these issues extensively, but as time has passed and I am hard of hearing, I rely on written records and took detailed notes during the hearing. My notes and filings confirm the omissions, and I now face humiliation and reputational damage due to your deceitful alterations. I hope I am wrong about the hearing, but the evidence suggests otherwise. I trust you will rectify this matter promptly.

Sincerely,
Pete Szmurlo
Pro Se Litigant

P.S. See attached sent to 7CA today 9/5/2025.

---

[16] ▪R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941) ▪"If there are unsettled questions of state law in a case that may make it unnecessary to decide a federal constitutional question, the federal court should abstain until the state court has resolved the state questions." 17A Fed. Prac. & Proc. Juris. § 4241 (3d ed.), a.k.a. Moore's Federal Practice.

[17] ▪ "In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication." ▪ "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, where the policy relates to the enforcement of the criminal law . . . or the final authority of a state court to interpret doubtful regulatory laws of the state."

[18] A federal court can abstain under Pullman, if (1) the case presents an unsettled question of state law, and (2) the question of state law is dispositive of the case or would materially alter the constitutional question presented.

[19] ▪Under the Wilton-Brillhart Abstention Doctrine, both the Eleventh Circuit and Supreme Court have cautioned against a district court exercising its jurisdiction over a declaratory judgment action when "another suit is pending in a state court [1] presenting the same issues, [2] not governed by federal law, [3] between the same parties." Nat'l Tr. Ins. Co. v. Burdette, 783 F. Supp. 2d 1193, 1196 (M.D. Ala. 2011)

This courts injunction denial 11/21/24 framed it as a non appealable TRO, ECF 65 and 66 public statements not available to him, but should have been a record under rule 65 nonetheless, shows judicial bias and criminal violations and intent known, via misleading plaintiff and defendants on reliance (Tharp docket entry "TROs non appealable") of a concealed injunction ruling in ECF 65, 66, and 67, shielding unlawful injunction from review, denying TRO and injunction 4/4/25 as moot instead of remanding. Removal statute void 11/21/24 on each privileged admission, smj may be raised at any time, see last 3 pages of "first impression" 11/21/24 transcript, Tharp induced Plaintiff he "can wait for discovery", remand and respond to MTD since the state court rules(law) is different, Tharp stayed proceedings under Pullman and Wilton-Brillhart Abstention Doctrine abstention. The pattern is blacklisting plaintiff from state court and predicated on pretext federal usurpation of state law via sham lmra pretense, which waived at OSHA 9/19/23 and 11/21/24 couldn't afford plaintiffs reputation loss. Plaitniff moved for summary judgement and was refused as moot, yet Defendant's turning a MTD into a summary judgment and Court refused Plaintiff a fair response and hearing, but threshold issues SOL and SMJ never moot. As a matter of law and procedure plaintiff had due diligence, raised it in lower court who in an unlawful manner probed motive for suit with defendants and acts/omissions prejudiced Plaintiff as Court knew the defamation statements 11/21/24 but Defendants SMJ waiver IL 502 evidence, failed to raise absolute truth as a defense to factual falsifiable allegations as they cannot. Summary judgement should be granted.

The removal jurisdiction in this case appears fundamentally defective because the claims for defamation, IIED, and violations of the Illinois Personnel Record Review Act (IPRRA) and eavesdropping statutes do not require interpretation of any Collective Bargaining Agreement (CBA). For LMRA § 301 preemption to apply, resolution of the state law claim must be substantially dependent on analysis of the CBA. Plaintiff's claims arise from independent state law duties (privacy rights, defamation standards, and statutory IPRRA requirements) rather than waived contractual rights under a labor agreement.

The defendants' sham removal tactic—attempting to characterize state law claims as preempted by the LMRA when they themselves previously waived grievance procedures in OSHA and CCHR proceedings—further undermines jurisdictional legitimacy. This conduct suggests strategic manipulation of jurisdictional rules to avoid state court accountability for non-preempted claims. When a federal court lacks subject matter jurisdiction over removed claims, the removal itself is void ab initio, and the court has a non-discretionary duty to remand to state court. The court's failure to do so here constitutes reversible error. The judge's dismissal rather than remand of state law injunction and claims represents an extraordinary violation of jurisdictional limits, as federal courts cannot substantively adjudicate claims without proper jurisdiction.

The Anti-Injunction Act (28 U.S.C. § 2283) strictly limits federal courts' power to enjoin state court proceedings, with exceptions only for expressly authorized congressional acts, where necessary in aid of jurisdiction, or to protect or effectuate judgments. The injunction issued in case 09900 appears to lack the required factual findings and legal justification mandated by Federal Rule of Civil Procedure 65(d), which requires every injunction to state its reasons specifically with particularity. The judge's misclassification of a potentially long-term injunction

as a Temporary Restraining Order (TRO) represents serious procedural error. Under Fed. R. Civ. P. 65(b), TROs are emergency measures limited to 14 days without extension, while preliminary injunctions require notice, hearing, and specific findings. This misclassification illegally deprived parties and the public interest of the right to appeal under 28 U.S.C. § 1292(a)(1), which allows immediate appeals from interlocutory orders granting or denying injunctions but typically not TROs.

The eight-month delay in producing the transcript, followed by the revelation that the judge verbally denied injunctive relief while labeling it a "TRO" on the docket, suggests deliberate manipulation of the record to avoid appellate review. This conduct violates due process and the ministerial duty of courts to maintain accurate records. When a judge knowingly falsifies the record to conceal the nature of a ruling, it constitutes judicial misconduct exceeding the bounds of judicial immunity.

The judge's refusal to recuse despite apparent personal interest in the outcome (having been sued personally) creates an appearance of bias requiring vacatur of all orders. Under 28 U.S.C. § 455, judges must disqualify themselves when their impartiality might reasonably be questioned or when they have a personal bias concerning a party.

IL/Federal Rule of Evidence 502 establishes that when a party intentionally discloses privileged material in a proceeding, it may waive privilege as to undisclosed communications on the same subject matter if they ought in fairness to be considered together. At the injunction hearing, defendants apparently admitted to recording with one party consent and not two party consent under eavesdropping act, recording to IPRRA without consent altering IPRRA files and engaging in defamatory statements in or outside of administrative agencies—conduct entirely separate from any CBA interpretation.

These admissions create subject matter waiver extending to all communications concerning the same topics, potentially destroying privilege protections for defendants regarding their document alteration practices and defamation campaigns. The judge's failure to recognize this waiver and instead enjoin Plaintiff from pursuing state law claims based on these admissions constitutes reversible error.

Defamation, IIED, and IPRRA claims exist independently of any labor agreement because they protect fundamental state interests in licensing and safety in dangerous public elevator struck-by hazards, privacy, reputation, and documentary integrity. The Illinois eavesdropping statute creates standalone criminal liability and civil remedies without reference to employment relationships, just like defamation doesn't require an employmeny relationship. No preemption as these claims involve purely state law standards without requiring CBA interpretation.

The defendants' communications to peers, public records, unprivileged OSHA and or IDOL or CCHR containing allegedly defamatory statements constitute separate publications creating new causes of action each time they occur. These ongoing violations fall outside the "single publication rule" and represent fresh harms not barred by res judicata from prior proceedings.

Under Federal Rule 60(b)(4)(6), a judgment may be vacated at any time if the rendering

court lacked subject matter jurisdiction, raised any time any where. 09900 case presents compelling grounds for collateral attack because the removal was void ab initio, and the federal court exceeded its authority by adjudicating non-preempted state law claims. This approach avoids normal appellate timelines and may be pursued simultaneously with other remedies. A properly supported Rule 60(b)(4) motion must demonstrate: (1) the judgment is void due to jurisdictional defects; (2) the challenge applies to the entire proceeding; and (3) relief is necessary to prevent manifest injustice. The standard of review is de novo for jurisdictional questions, giving no deference to the trial court's determinations.

The pending Supreme Court petition presents multiple compelling issues: (1) whether fraudulent removal without jurisdiction voids all subsequent orders; (2) whether mischaracterization of injunctions as TROs to avoid appellate review violates due process; and (3) whether federal courts may enjoin state law claims based on preemption theories expressly contradicted by party admissions.

The newly obtained transcript demonstrates actual judicial statements contradicting the docket entry from 11/21/24 ECF Nos. 65, 66, 67, 109-156. Plaintiff is requesting certification of questions to the Illinois Supreme Court regarding interpretation of IPRRA and eavesdropping statutes to emphasize the important state law interests improperly adjudicated by federal court, The Seventh Circuit to certify questions to the Illinois Supreme Court regarding: (1) whether IPRRA creates private rights enforceable against non-employers making false reports/references to IL/government agencies; (2) whether Illinois eavesdropping statutes apply to oral communications behind closed doors at school *(Boron)* altered in transmission *(Defendants, Tharp-Fitzgerald)*; and (3) whether state law claims for defamation and IIED in public FOIA contexts are actionable not inherently preempted by LMRA. Certification would acknowledge that state law claims predominated and were improperly adjudicated federally.

The defendants' ongoing publications to IPRRA, OSHA, CCHR, and other entities constitute fresh violations creating new causes of action not barred by preclusion or SOL. Plaintiff's action in Cook County Circuit Court emphasized: (1) each defamatory communication creates separate claims; (2) IPRRA provides statutory penalties for each violation; and (3) no LMRA preemption applies because no CBA interpretation is required.

While judges enjoy absolute immunity for judicial acts within their jurisdiction, this protection does not extend to: (1) actions taken in complete absence of jurisdiction; (2) administrative or ministerial functions; or (3) acts constituting criminal behavior. The knowing falsification of court records (mislabeling injunction as TRO), (transcript) exceeds judicial immunity because it involves fraudulent administrative action rather than adjudication.

For egregious misconduct exceeding judicial authority, judges may be subject to public scrutiny and critique. This case presents extraordinary circumstances involving void removal, fraudulent characterization of court orders, judicial bias, and systematic denial of access to state court remedies.

The fundamental premise remains that the federal court never properly acquired original jurisdiction over state law claims, rendering all subsequent orders voidable. The defendants' subject matter waiver through admissions at the TRO hearing and prior administrative

proceedings destroys any colorable preemption argument, while the judge's procedural violations in handling the 6 month tro injunction provide independent grounds for relief across multiple appellate pathways. The court improperly exercised jurisdiction over non-preempted claims, and forms a basis for collateral attack.

### 1 Introduction to Collateral Attacks on Res Judicata

A collateral attack on a judgment refers to an attempt to impeach the validity of a judgment in a proceeding that is not directly an appeal from that judgment. Unlike a direct appeal which challenges the merits of a court's decision, a collateral attack challenges the validity of the judgment itself based on specific jurisdictional or procedural defects that render the judgment fundamentally void or unenforceable. This distinction is crucial when dealing with cases involving multiple defendants removed from state court to federal court under LMRA or ERISA preemption theories where Plaintiff's claims (like defamation and IIED) survive preemption.

The doctrine of res judicata (claim preclusion) generally prevents relitigation of claims that have been finally decided on the merits or that could have been raised in prior litigation between the same parties or their privies. However, res judicata is not absolute and may be challenged collaterally under exceptional circumstances where the initial judgment suffers from fundamental flaws that undermine its validity as a binding judgment. Understanding these exceptions is particularly important in complex multi-defendant cases where LMRA preemption issues create uneven jurisdictional grounds across claims and defendants.

### 2 Grounds for Collateral Attack on Judgments

2.1 Jurisdictional Defects -    The most common basis for a successful collateral attack is lack of jurisdiction over the subject matter or parties. A judgment rendered by a court that lacked jurisdiction is void and may be challenged at any time, even collaterally. In the context of removal based on LMRA § 301 preemption, if the federal court actually lacked subject matter jurisdiction because the claims were not sufficiently preempted, the resulting judgment might be vulnerable to collateral attack. This is particularly relevant where some claims (like defamation and IIED) were not completely preempted but were nevertheless adjudicated in federal court.

2.2 Procedural Due Process Violations -    Judgments may be collaterally attacked when they result from fundamental procedural defects that violate due process. This includes situations where a party was not given proper notice of the proceedings or an adequate opportunity to be heard. If the preemption determination was made without providing all parties a full and fair opportunity to litigate the jurisdictional issue, this might provide grounds for collateral attack.

2.3 Extrinsic Fraud -   Fraud upon the court or extrinsic fraud that prevents a party from fully presenting their case can justify collateral relief. This differs from intrinsic fraud (such as perjured testimony), which generally must be addressed on direct appeal. Extrinsic fraud might include misleading the court about the preemptive effect of the LMRA or concealing critical information about the nature of the claims.

### 3 LMRA Preemption and Partial Removal Scenarios

3.1 LMRA Section 301 Preemption Principles -     The Labor Management Relations Act (LMRA) § 301 preempts state law claims that are "substantially dependent on analysis of a

collective bargaining agreement" (CBA). However, not all employment-related claims are preempted. Claims that only tangentially involve a CBA or can be resolved without interpreting the agreement may survive preemption. In your case, the defamation and IIED claims likely fall into this category, as they involve independent state law duties rather than contractual rights under a CBA.

3.2 Multiple Defendant Context -     With multiple defendants, preemption analysis may vary across defendants. Some defendants may have stronger connections to the CBA than others. For example, an employer is more likely to have LMRA preemption apply than individual supervisors whose actions might form the basis of defamation or IIED claims. This creates a scenario where removal might be improper as to some defendants but proper as to others, potentially undermining the entire removal jurisdiction if the preempted claims are not completely separable.

3.3 Jurisdictional Complications -     When a case is removed based on LMRA preemption but contains both preempted and non-preempted claims, federal courts exercise supplemental jurisdiction over the non-preempted state law claims. However, if the preempted claims are dismissed early in the litigation, the court may decline to exercise supplemental jurisdiction over the remaining state law claims, potentially leading to remand. The court improperly exercised jurisdiction over non-preempted claims, and forms a basis for collateral attack .

4 Waiver Doctrines: FRE 502 and Subject Matter Waiver

4.1 Federal Rule of Evidence 502 Principles -     FRE 502 provides uniform standards concerning waiver of attorney-client privilege and work product protection. Under Rule 502(a), a subject matter waiver occurs when a disclosure waiving privilege or protection is intentional and the disclosed and undisclosed communications or information concern the same subject matter, and they ought in fairness to be considered together. However, Rule 502(b) provides that an inadvertent disclosure does not operate as a waiver if the holder took reasonable steps to prevent disclosure and promptly took reasonable steps to rectify the error.

4.2 Subject Matter Waiver Doctrine- Subject matter waiver extends beyond the specific disclosed communications to all communications on the same subject matter when fairness requires. This occurs when a party intentionally puts protected information into the litigation in a selective, misleading, and unfair manner. However, subject matter waiver is limited to unusual situations where fairness requires further disclosure of related, protected information to prevent a selective and misleading presentation of evidence.

4.3 Application to Your Case

If defendants made selective disclosures of privileged information to support their preemption arguments while withholding related privileged information that might undermine those arguments, they might have triggered a subject matter waiver under FRE 502(a). This could open the door to challenging the jurisdictional findings that supported res judicata effect. Additionally, if any disclosures were inadvertent, applying the factors in FRE 502(b) might help protect against broad waiver arguments.

5 Judicial Estoppel Principles and Application

5.1 Doctrine of Judicial Estoppel -     Judicial estoppel prevents a party from asserting a position

in a legal proceeding that is contrary to a position they successfully asserted in the same or some earlier proceeding. It is designed to protect the integrity of the judicial process by preventing parties from playing "fast and loose" with the courts through deliberate manipulation. The doctrine applies when: (1) a party's later position is clearly inconsistent with its earlier position; (2) the party succeeded in persuading a court to accept the earlier position; and (3) the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

5.2 Quasi-Judicial Statements as Positions-   Quasi-judicial statements made in administrative proceedings, depositions, or other formal settings may qualify as positions for judicial estoppel purposes. If defendants made representations in the removal context or in proceedings before administrative agencies that are inconsistent with positions taken in the federal court litigation, judicial estoppel might prevent them from benefiting from the inconsistent positions.

5.3 Application to LMRA Preemption Context -      As defendants took the position in removal papers that certain claims were preempted by the LMRA (thus creating federal jurisdiction) but earlier/later took inconsistent positions in other contexts (such as arguing before other tribunals that the same claims were not preempted), judicial estoppel bars to prevent them from relying on the preemption theory to support res judicata. This is particularly powerful due to the court accepted the preemption argument and remanded or dismissed claims based on it.

    6 Equitable Estoppel Doctrines and Applications

6.1 Equitable Estoppel Elements -    Equitable estoppel prevents a party from taking a position that is inconsistent with earlier conduct when that consistency would work injustice to another who relied on the earlier conduct. The elements typically include: (1) a false representation or concealment of material facts; (2) made with knowledge of the facts; (3) with the intention that it be acted upon; and (4) reasonable reliance by the party seeking estoppel to their detriment .

6.2 Distinction from Judicial Estoppel -      While judicial estoppel focuses on protecting the judicial system from manipulation, equitable estoppel focuses on fairness between the parties based on representations and reasonable reliance. After defendants made quasi-judicial statements that induced Plaintiff's reliance to Plaintiff's detriment via "no grievance filed" they attached the surreptitiously recorded non quasi judicial 7/20-24/23 falsified electronic communication of oral context behind closed doors at school which also had subject matter waivered any grievance as noted in complaint, and "nobody has your Personnel File" while Plaintiff 7/20/23 informed the first-impression group that slander statements are defamatory and this is first publication of libel 7/20/23 he was unaware of and also didn't have this in his employee file, then Plaintiff controlled his file putting his correction and written remarks on 9/1-6/25. They now seek to take contrary positions to support res judicata, equitable estoppel bars them from doing so.

6.3 Government Context Considerations -    While equitable estoppel against government entities is traditionally disfavored, most jurisdictions recognize it can apply in appropriate circumstances, particularly when government actors engage in affirmative misconduct. The Seventh Circuit has acknowledged that estoppel principles may apply against government entities in exceptional cases where the traditional elements are met and the public interest would not be unduly harmed. The certified questions to state court in Appellant brief and general

jurisdiction precedent is state courts control their law, see *Glacier Northwest,* but for IPRRA and Eavesdropping and defamation and IIED and false light in which the removal statute is void for each and remand pursuant to 1447 is required.

### 7 Strategic Considerations for Challenging Res Judicata

7.1 Procedural Mechanisms for Collateral Attack -   Collateral attacks on judgments typically proceed through independent actions in equity or motions under Rule 60(b) of the Federal Rules of Civil Procedure. Rule 60(b)(4) allows a court to relieve a party from a final judgment if the judgment is void, while Rule 60(b)(6) provides a catch-all for any other reason justifying relief. These mechanisms may be available to challenge the res judicata effect of a judgment rendered without proper jurisdiction or through unfair process.

7.2 Sequencing of Arguments -        When challenging res judicata collaterally, strategic sequencing of arguments is important. First, challenge the validity of the judgment itself based on jurisdictional defects. Then, argue alternative theories such as judicial estoppel or waiver that would prevent defendants from benefiting from the judgment even if it is valid. This layered approach maximizes the chances of success on at least one theory.

7.3 Evidence Development -        Developing evidence of inconsistent positions across proceedings is crucial for judicial estoppel arguments. This may involve discovery regarding defendants' positions in other cases or administrative proceedings. Similarly, for waiver arguments, carefully documenting disclosures of privileged information and their context is essential for establishing subject matter waiver under FRE 502.

This successfully avoids the preclusive effect of the prior judgment and obtains relief on the merits of defamation and IIED claims. The courts bias and clear errors harmed de novo chances of success, as 7/28/25-8/27/25 developing evidence of inconsistent positions across proceedings(each Defendants, Tharp-Fitzgerald), documenting all latest disclosures of privileged information related to jurisdictional issues emphasizing the fundamental jurisdictional defects in the original judgment.

Table: Affirmative Defenses to Challenging Res Judicata

| Pl. Strategy | Legal Basis | Evidence Needed | Relief Potential |
|---|---|---|---|
| **Collateral Attack** | Jurisdictional defects in original judgment | Proof that claims were not preempted by LMRA | Judgement declared void |
| **Judicial Estoppel** | Inconsistent positions in different proceedings | Prior statements contradicting preemption argument | Defendants estopped from asserting res judicata |
| **Equitable Estoppel** | Detrimental reliance on defendants' representations | Evidence of reliance on statements about claim nature | Defendants barred from taking contrary position |
| **Subject Matter Waiver, IL Rule 502, 804, 805, 806, 808** | Selective disclosure of privileged information | Documentation of privileged disclosures and omissions | Expanded discovery rights regarding jurisdiction |

8 Conclusion -      Challenging the res judicata effect of a judgment in multi-defendant LMRA cases requires careful analysis of jurisdictional defects, waiver doctrines, and estoppel theories. The combination of partial preemption scenarios with multiple defendants creates unique opportunities to argue that the judgment should not be given preclusive effect, particularly as to non-preempted claims like defamation, IPRRA, IL eavesdropping, and IIED.

Case 2024L009451 (09900) appears to present several promising arguments: (1) collateral attack based on jurisdictional defects as the federal court improperly exercised jurisdiction over non-preempted claims; (2) judicial estoppel as defendants took inconsistent positions about the nature of the claims in different proceedings; (3) equitable estoppel 10/10/2024 (removal filed) Plaintiff reasonably relied on defendants' 9/19/23 OSHA waiver quasi-judicial statements to his detriment 8/26/24 filing in CCCC and 11/09/24 remand motion written for sham removal lawsuit filed for public participation defamatory statements; and (4) subject matter waiver under IL 502 / FRE and hearsay within hearsay by declarant 11/21/24 and 9/19/23 (hearsay useable in conspiracy) the court clearly erred on evidence before it in complaint, remand, and injunction law, distinct from defendants made selective disclosures of privileged information to support their jurisdictional arguments.

**Exhibit B**

# Exhibit B

```
1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3   PETE SZMURLO,                    )  Case No. 24 C 9900
                                     )
4                  Plaintiff,        )
                                     )
5       v.                           )
                                     )
6   TK ELEVATOR CORPORATION, et      )
    al.,                             )  Chicago, Illinois
7                                    )  November 21, 2024
                   Defendants.       )  11:07 a.m.
8

9            TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
             BEFORE THE HONORABLE JOHN J. THARP, JR.
10
    APPEARANCES:
11
    Pro Se Plaintiff:       MR. PETE SZMURLO
12                          7951 Calumet Avenue, #1142
                            Munster, Indiana 46321
13
    For Defendant          FISHER & PHILLIPS LLP
14  TK Elevator:           BY:  MS. DANIELLE M. KAYS
                           10 S. Wacker Drive, Suite 3450
15                         Chicago, Illinois 60606

16  For Defendant          DOWNS RACHLIN MARTIN PLLC
    Otis Elevator:         BY:  MS. KRISTA A. GAY
17                              MR. TIMOTHY E. COPELAND, JR.
                           132 Main Street, Suite 212
18                         Brattleboro, Vermont 05301

19
    For Defendant          LITCHFIELD CAVO
20  Schindler Elevator:    BY:  MR. BRIAN HOPPE
                           303 W. Madison Street, Suite 300
21                         Chicago, Illinois 60606

22  For Defendant          OGLETREE, DEAKINS, NASH, SMOAK &
    Kone:                  STEWART, P.C.
23                         BY:  MS. KRISTINA WRIGHT
                           155 N. Wacker Drive, Suite 4300
24                         Chicago, Illinois 60606

25
```

2

```
 1    APPEARANCES   (Cont'd):

 2    For Defendant          O'DONOGHUE AND O'DONOGHUE LLP
      Internation Union:     BY:  MS. JENNIFER R. SIMON
 3                           5301 Wisconsin Avenue NW, 8th Floor
                             Washington, DC 20015
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Court Reporter:        KELLY M. FITZGERALD, RPR, RMR, CRR
                             Official Court Reporter
21                           219 S. Dearborn Street, Room 1412
                             Chicago, Illinois  60604
22                           (312) 818-6626
                             kmftranscripts@gmail.com
23                                  *   *   *   *   *

24
                       PROCEEDINGS REPORTED BY STENOTYPE
25        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

```
 1         (Proceedings heard in open court:)
 2              THE COURT:  Case 24 CV 9900, Szmurlo, do I have that
 3    right?
 4              THE PLAINTIFF:  Yes, Szmurlo, thank you.
 5              THE COURT:  Versus TK Elevator, et al.
 6              Mr. Szmurlo is present in court representing himself.
 7              And counsel?
 8              MS. WRIGHT:  Kristina Wright for defendant Kone, Inc.
 9              THE COURT:  All right.  And I understand we have some
10    folks on the phone as well.
11              MS. KAYS:  My name is Danielle Kays, and I'm the
12    attorney for TK Elevator.
13              MS. GAY:  My name is Krista Gay, and I'm an attorney
14    for Otis Elevator.
15              MS. SIMON:  My name is Jennifer Simon, and I'm
16    attorney for IEC Local 2, NEIEP, National Elevator Industry
17    Educational Program, and the Joint Apprenticeship Committee,
18    Local 2.  Good morning.
19              THE COURT:  Good morning.
20              THE CLERK:  Mr. Hoppe?
21              MR. HOPPE:  Good morning, Judge.  My name is Brian
22    Hoppe for Schindler Elevator.  Sorry.  I didn't want to talk
23    over anyone.
24              THE CLERK:  And Mr. Copeland?
25              MR. COPELAND:  I'm Timothy Copeland, Your Honor, also
```

1    for Otis Elevator Company.

2         THE COURT:  All right.  Is there anyone we haven't

3    connected with here?

4         All right.  I'll ask the folks who are on the phone to

5    please be sure to identify yourselves before you make any

6    statements so we have an accurate record of the proceedings.

7         I set this case for hearing this morning after

8    receiving Mr. Szmurlo's motion for temporary restraining order

9    which has since been docketed.

10        I trust everyone has had access or the ability to

11   obtain access to that pleading?  All right.  Hearing no

12   dissent.

13        All right.  There's -- this case had already got my

14   attention because we have quite a few filings and motions that

15   have been filed and requests for extensions of time and things

16   like that.  So I want to address overall picture of where the

17   case is and get a schedule going forward here.

18        But let me start, since it's the ostensible trigger

19   for why we're here, I'll start with Mr. Szmurlo.  And,

20   Mr. Szmurlo, I've -- obviously I have your TRO motion.  I have

21   some questions about the motion.  But let me -- before I start

22   talking, I'll give you the opportunity to explain the gist of

23   your motion and your request for a temporary restraining order.

24        THE PLAINTIFF:  Thank you, Your Honor.

25        Pete Szmurlo.

1          Do I need to talk in here like that?

2          THE COURT:  That's fine.

3          THE PLAINTIFF:  Yes.

4          The defendants continue to defame me and spread false

5     statements about July 10th, 11th, 12th, 13th and 14th and

6     continue to spread my communications, private communications,

7     e-mails, texts, my transcript at school, and they continue to

8     do so, you know, behind my back.  I'm not able to know until

9     the harm has already occurred.

10          THE COURT:  When you say they continue to make these

11     statements, what's your basis for -- how do you know about

12     these statements?

13          THE PLAINTIFF:  Yes.  So, for example, yesterday we

14     were e-mailing back and forth.  And the defendants, D. Kays

15     participant, shared my communications again.  And that's why

16     I'm here today to stop all that.

17          THE COURT:  Well, why -- what is your argument that

18     sharing communications that you have made with a defendant is

19     something unlawful or that should be subject to injunctive

20     relief?

21          THE PLAINTIFF:  Yeah.  So, for example, yesterday we

22     were e-mailing all together our, you know, the case -- case,

23     defendants and I.  And all their e-mails, not all but most of

24     them say, you know, confidential, do not share, yada, yada.

25          And then yesterday, D. Kays shared with the courtroom

1    deputy here, I don't know if she's in the room.

2                THE COURT:  The courtroom deputy is in the room.

3                THE PLAINTIFF:  Right, of course.

4                And so I never consented to D. Kays sharing that with

5    the deputy, and that's a warrantless invasion of my privacy,

6    and, you know --

7                THE COURT:  All right.

8                THE PLAINTIFF:  -- violates my Fourth Amendment.

9                THE COURT:  Okay.  A couple of things here,

10   Mr. Szmurlo.

11               The Fourth Amendment is not implicated here.  The

12   Fourth Amendment protects against state action, not the action

13   of private parties.  And certainly the communications between

14   the parties to this case and the Court are not going to be the

15   basis of a restraining order.

16               You sued a group of defendants.  They are entitled to

17   communicate about that case and respond to that case and

18   interact with the Court and with each other with respect to

19   that case.  You know, the issue of were there defamatory

20   statements made back in mid-2023 is a different matter than the

21   question of, you know, have the defendants in the case

22   reiterated or referred to, you know, communications back at

23   that period of time.  That's not going to be the ground for

24   injunctive relief here.  They have to be able to communicate

25   and respond to the allegations and claims that you've advanced

1    against them.

2         THE PLAINTIFF:  May I?

3         THE COURT:  Go ahead.

4         THE PLAINTIFF:  To be specific, it's not about

5    communications between the counsel and I, defense and I.  It's

6    sharing my text messages as well at CCHR.  But specifically in

7    the e-mails, I respect the courtroom deputy here, but I would

8    not just give her my communications.  You know, that would

9    require a warrant.

10         THE COURT:  It doesn't require a warrant, Mr. Szmurlo.

11    Again, the government is not seeking your communications, is

12    not violating your privacy in any way.  The -- you've initiated

13    the lawsuit that has put these statements in play.  And it's

14    you and the defendants who are having these communications.

15    The government has nothing to do with this other than providing

16    a forum for resolution of the dispute.

17         THE PLAINTIFF:  Correct, sir, which is why I don't

18    believe sharing communications with the courtroom deputy is

19    appropriate or not a violation of the Illinois eavesdropping

20    law.

21         THE COURT:  All right.  Well, clearly sharing

22    communications with the Court is not improper, and that's not

23    going to be the basis of any injunctive relief, preliminary or

24    ultimately if you succeed on the merits.  So if there's any

25    other basis for your TRO, provide it, but that's not a basis

1    for a TRO.

2            THE PLAINTIFF:  Correct.  That's part of a pattern

3    that they are sharing my communications.  Like I said, my

4    messages at CCHR between my boss, you know, my boss and I

5    texted on my personal phone and also on my work phone.  And as

6    far as my personal cell phone goes, again, I believe that's a

7    violation of the Illinois eavesdropping law and they should not

8    be sharing my communications, whether it pertains to what --

9    what they tried to say it pertains to.

10           THE COURT:  All right.  If you had conversations with

11   the defendants where they're a party to the case, that's not

12   going to implicate the eavesdropping law.  The eavesdropping

13   law relates to surreptitious recording of conversations, not

14   the sharing of communications that people were parties to.

15   It's not a violation of the Illinois eavesdropping law for a

16   party who has a conversation with you to relate the contents of

17   that conversation to someone else.

18           You know, again, depending on what the communication

19   is, maybe you've got a defamation claim, or, you know, again,

20   maybe the claim -- this is no comment on the merits of your

21   claim based on what happened in mid-2023.  But if you have a

22   conversation with another person and that other person relates

23   that conversation, that's not -- that doesn't implicate or give

24   rise to a need for a restraining order, particularly in the

25   context of where you've got a lawsuit and you're having

1   communications about the lawsuit that you initiated.  You know,

2   you can't initiate a lawsuit and then gag the defendants and

3   prevent them from being able to communicate about the lawsuit

4   or respond to the allegations of the lawsuit which is what I'm

5   understanding you to be seeking to do.  If I'm misunderstanding

6   what you're saying, please clarify for me.

7           THE PLAINTIFF:  Yes, sir.  I believe that we have a

8   misunderstanding.

9           I don't mean that they cannot communicate, you know,

10  among the case or amongst the case.  What I'm specifically

11  saying is invasion of my privacy and the Illinois eavesdropping

12  law is that they're not relaying information about the case.

13  You know, they are sending, transcribing, or surreptitiously

14  screenshotting my messages that I didn't consent to them to do.

15  I'm not saying that they can't talk about the case or state

16  their opinions, but when they share the text messages just

17  recently at CCHR, they then took those words out of context and

18  spun it around on me in another defamatory statement which I

19  understand it's not in the complaint yet, but they continue to

20  like, for example, yesterday spread my exact communications

21  with the courtroom deputy.

22          THE COURT:  Which you had sent to them?  You had sent

23  these text messages to them?

24          THE PLAINTIFF:  E-mail, sir.  We were e-mailing about

25  if they held any objections to the Court.  And like I said,

1   most of the defendants' e-mails contained, you know,

2   confidentiality, this, that.

3          And I called the deputy yesterday and spoke with her.

4   Then I e-mailed the defendants after I spoke with the deputy.

5   But in no way did I, you know, screenshot the e-mails or

6   anything like that and send it to the deputy which would be a

7   violation of the Illinois eavesdrop law.

8          THE COURT:  All right.  I'm still not entirely clear

9   on exactly what your complaint is but let me -- let me hear

10  from the principal defendant, at least the lead defendant in

11  the caption, TK Elevator.

12         MS. KAYS:  Yes.  Thank you, Your Honor.

13         I think it would be helpful --

14         THE CLERK:  Please introduce yourself.

15         THE COURT:  Oh, I'm sorry, Counsel.

16      (Unreportable crosstalk.)

17         THE COURT:  Counsel.

18         MS. KAYS:  Excuse me.  Yes.

19         THE COURT:  Give us your name.

20         MS. KAYS:  Yes.  This is Danielle Kays on behalf of TK

21  Elevator.

22         THE COURT:  Okay.  Thank you.

23         Go ahead.

24         MS. KAYS:  So I think to start, maybe I'll just

25  attempt to clarify I think two things that he's claiming are

1   communications that he believes are subject to the TRO.  And

2   then if I can, then I'll maybe give a little bit more, you

3   know, arguments about our defenses to the TRO.

4          So what I'm understanding is that when Mr. Szmurlo

5   tried to schedule this TRO for hearing, we received notice

6   about it one hour in advance by e-mail.  And in response, we

7   contacted the deputy to understand if we needed to appear at

8   the hearing.  There were no other communications in addition to

9   that e-mail that we sent to the deputy except for I think

10  Mr. Szmurlo's notice to us of the hearing.

11         I dispute, of course, that any communications that we

12  sent to the Court, as you mentioned, Your Honor, would be

13  subject to a TRO.  But I just wanted to attempt to clarify.  I

14  believe that's what he's referring to as to yesterday.

15         Just to give you a little bit more background on what

16  I believe is his second concern is the plaintiff has against my

17  client at least initiated a number of proceedings.  There was

18  an OSHA claim that he initiated.  I don't have the exact date,

19  but it was, you know, prior to this lawsuit that he filed in

20  August 2024.  And that claim has been dismissed and resolved.

21         He also filed earlier this year a charge

22  discrimination with the Chicago Commission on Civil Rights, and

23  that's specifically what he's referring to when he says CCR --

24  or CCCR.  We are a party in that, and we have responded, of

25  course, to information that's requested of us in that

1    investigation.  That charge, that proceeding, and the

2    underlying charge relate directly to his performance, of

3    course.

4           And then we now have this lawsuit that is pending

5    before this Court.

6           In this -- just as some background, plaintiff's claims

7    in this lawsuit all relate to certain statements that were

8    allegedly made about him, about his performance or lack thereof

9    relating to his job duties and which resulted in discipline and

10   termination with TK Elevator.

11          There's three counts, you know, stemming from those

12   claims that he makes of defamation, defamation per se, and

13   intentional infliction of emotional distress.  Just to clarify,

14   there is no Illinois eavesdropping law claim made in his

15   underlying complaint.

16          He seeks a variety of damages in his underlying

17   complaint for compensatory damages, for lost wages and

18   benefits, emotional distress, harm to professional reputation,

19   punitive damages.  And he does not seek any injunctive relief

20   that we can tell.  You know, it's not very clear exactly, you

21   know, what he is asserting at some times in his complaint and

22   also in his TRO, but that's our understanding.

23          He mentioned that he seems to be asking to restrain my

24   clients and myself and potentially, as I understand, all

25   defendants, although they would not be a party to that charge

1  that I mentioned before the CCR -- CCCR, excuse me.  But he

2  seeks to restrain us all from spreading any information

3  relating to his performance while he worked at TK Elevator.

4  Again, his employment at TK Elevator ended July 2023.  And from

5  what I can understand is that he doesn't want us responding to

6  the Chicago Civil Rights Commission's request for information

7  in their proceedings.

8         THE COURT:  Let me -- let me interrupt you.

9     (Unreportable crosstalk.)

10        THE COURT:  Let me interrupt you, Ms. Hayes, right

11 there, and just ask Mr. Szmurlo, do you -- is that accurate

12 from your perspective?  Is that what your concern is?

13        THE PLAINTIFF:  Negative.  It's not accurate, sir.

14 I'm not trying to restrain information relating to myself.  I'm

15 seeking to restrain the false statements of facts, false

16 material facts.  Like I said --

17        THE COURT:  But are you seeking to -- are you

18 predicating your request for a TRO based on information that

19 they have submitted in the course of this proceeding before the

20 CC -- CCCR?

21        THE PLAINTIFF:  That's one -- one area that I know of

22 with evidence of them spreading my Illinois communications.

23        THE COURT:  All right.  And, again, that's a

24 proceeding that you initiated by filing some sort of

25 administrative complaint in that commission?

1    THE PLAINTIFF:  Yes.

2    THE COURT:  Okay.  All right.

3    Go ahead, Ms. Hayes.

4    MS. KAYS:  Thank you.  And just for the record, it's

5    Kays, with a K.

6    THE COURT:  Oh, I'm sorry.

7    MS. KAYS:  I know it's hard on the phone, so thank

8    you.

9    So there are a number of reasons why plaintiff's

10   motion for temporary restraining order should be denied.  You

11   know, there's three elements that he has to prove in order to

12   demonstrate that a TRO is necessary.  You know, of course we

13   don't see that any of those elements have been addressed in a

14   TRO so it fails for that reason, but I'll address them here.

15   He has to establish that he'll suffer immediate and

16   irreparable harm if the TRO is not granted, that there's no

17   adequate remedy at law, and that his harm cannot be adequately

18   remedied by the monetary damages or decisions in this

19   underlying court action.

20   And, finally, he has to show that -- or not finally,

21   but next he has to show that he's likely to succeed on the

22   merits of this underlying case.  We assert he cannot do any of

23   these three things; that the harm he will suffer if the TRO is

24   not granted outweighs the harm that TK Elevators would suffer

25   if the TRO is granted; and that the public interest is best

1    served by granting a TRO.

2            I can go into those elements, Your Honor, if you'd

3    like further to advise the Court why this TRO is not

4    sufficient; but I defer to you if you'd like me to continue.

5            THE COURT:  Well, let -- what I want to understand

6    here is, you know, again, I'm trying to understand the -- what

7    current conduct is happening that Mr. Szmurlo is seeking to

8    enjoin or, you know, prohibit.  And I'm --

9            MS. KAYS:  And, Your Honor, if I may respond to that?

10           THE COURT:  What I'm taking from -- what I'm taking

11   from what I'm hearing at this point is still that Mr. Szmurlo

12   is concerned about, you know, the distribution of information

13   and conversations that he's had with the plaintiffs -- or

14   excuse me -- with the defendants in connection with that agency

15   proceeding and with respect to this case.

16           And, again, I -- what I need to understand from

17   Mr. Szmurlo is, you know, why -- well, to put it in the context

18   of the TRO motions, or TRO requirements, you know, why -- why

19   does -- do those communications entitle you to a TRO?

20           Go ahead.

21           THE PLAINTIFF:  Yes, sir.  Thank you for asking that.

22           So specifically, the harms like Danielle, or D. Kays

23   just was explaining about, she said there's two agencies, two

24   complaints, OSHA and CCHR.  And then, you know, she wasn't

25   representing us -- or she wasn't representing them at OSHA.

1    She was representing them at CCHR.  So a little bit of time

2    between the -- the other agency complaints.  And specifically

3    the first -- the first instance at OSHA the defendants did

4    both -- both things I'm requesting from a TRO which is the

5    first of their pattern, and the CCHR is the second of their

6    pattern.  And specifically they lied at -- or they made false

7    statements at OSHA and then contradict themselves here at CCHR.

8    And, you know, like I'm trying to explain for the TRO, I don't

9    consent to my communications being shared whatsoever.  You

10   know, they need to ask me -- or two party, you know, two-party

11   communications I don't consent to them.

12           Danielle having them or speculating on them, like she

13   just said my discipline or lack thereof, how do you know that,

14   Danielle?  How do you know that -- where did you get that

15   information from that I'm -- you know, I was disciplined?

16           THE COURT:  All right.  Ms. Kays, what -- what do you

17   have to say in terms of this invocation of the Illinois

18   Eavesdropping Act?

19           MS. KAYS:  Well, one, it's not relevant in this

20   hearing or in this case at all because it's not a claim that is

21   asserted in his underlying complaint, and, therefore, it's not

22   proper for a TRO either.

23           THE COURT:  Well, to be -- let me just interrupt you

24   again right there.

25           I'm not sure I completely buy that if -- I understand

1   it's not the premise of his -- the claim that has been filed in

2   this case.  There's no reference to claims of violation of the

3   Illinois Eavesdropping Act.  But if -- if Mr. Szmurlo is here

4   seeking an injunction because defendants had, you know -- you

5   know, obviously I'm just making this up as an extreme example,

6   had, you know, threatened his safety, the fact that that wasn't

7   a part of his claim in the lawsuit I don't think would

8   necessary preclude me from entering an injunctive relief that,

9   you know, addressed that conduct.  So, you know, if there is

10  ongoing conduct that is, you know, a violation of Illinois law,

11  that might be something that would warrant injunctive relief

12  from the Court.

13          So let's focus instead on whether any response you

14  have to Mr. Szmurlo's claim that in sharing these

15  communications that you or others have had with them that

16  you're violating the Illinois Eavesdropping Act.

17          MS. KAYS:  Sure, Your Honor.

18          So the Illinois Eavesdropping Act prohibits a party

19  from disclosing -- knowingly disclosing communications,

20  recordings, to which they are not a party.  The only

21  communications that I am able to discern from the TRO and from

22  our conversations today, as the Court pointed out, are

23  conversations in which my client was undeniably a party.  They

24  related to his employment.  They -- he -- he mentioned himself

25  that they are communications with party -- or individuals at

18

1   TK Elevator.  So we did not surreptitiously, you know,

2   intercept, record any communication to which we are not a

3   party.

4            And second is that our use of any communications from

5   our own, you know, documents in defense of claims in a judicial

6   or any quasi-judicial proceeding including before the CCHR

7   is --

8        (Audio interruption.)

9            THE COURT:  Hold on.  Hold on, Ms. Kays.  I'm sorry.

10  Our court reporter -- something just sounded in the background

11  and we missed your last couple of statements, if you could

12  backtrack.

13           MS. KAYS:  Sure.

14           I think maybe that was right around the time that I

15  was talking about our use of any communications and responding

16  or providing them to the human rights agency or in a judicial

17  proceeding is, number one, responding to claims that the

18  plaintiff has made against us and initiated against us; and,

19  number two, they are -- they are privileged, they're absolutely

20  privileged because they are made in the course of the judicial

21  proceeding or, you know, in respect to the Chicago Commission

22  on Human Rights, a quasi-judicial proceeding.  So they're

23  subject to privilege.  You know, we're not -- he is not making

24  the claim, and there's no allegations or truth to us giving

25  this to anybody else; but regardless, again, you know, that's

1    the second element.  I mean, we are parties to the

2    communications anyways.

3              It seems that he disagrees with, you know, our

4    defenses to the charge that he has pending and to our defenses

5    to this case, but that doesn't entitle him to a TRO.  And so

6    there's -- you know, there's no -- no evidence, number one,

7    that we are in violation of the Illinois Eavesdropping Act.

8              I can continue on as to the other elements, but I

9    wanted to respond to that question that you just asked.

10             THE COURT:  All right.  And thank you.

11             And I want to go back to Mr. Szmurlo for a minute,

12   too.

13             Mr. Szmurlo, the original statements that your claims

14   are predicated on date back to mid-2023.  You filed this

15   lawsuit I think in October, just a month or so ago.  Is that --

16   I probably have the date right here.

17             THE PLAINTIFF:  About right, in August, sir.

18             THE COURT:  Okay.

19             THE PLAINTIFF:  It was served in September.

20             THE COURT:  All right.  So more than a year after the

21   statements that you're complaining about were made, the --

22             THE PLAINTIFF:  Some of them.

23             THE COURT:  -- the statements that are more recent

24   relating to these -- this lawsuit seem to cover the same kinds

25   of issues, your statements about your work performance,

1    statements about incidents on which the claims are founded,

2    that don't seem qualitatively different than the claims that

3    are the predicate for the lawsuit, meaning the 2023 statements.

4         You've not sought any injunctive relief for over a

5    year based on those kinds of statements.  One of the grounds

6    that you have to satisfy to get injunctive relief is to

7    demonstrate irreparable harm.  You know, those statements have

8    been -- most of the statements that you're complaining about

9    have been out there for more than a year now.  How do you --

10   what's your argument that you're suffering irreparable harm by

11   the fact that those statements were, you know, put into the

12   public record, so to speak, you know, as far back as a year

13   ago?

14        THE PLAINTIFF:  I'm sorry.  Can you just clear up your

15   question for me?

16        THE COURT:  Yeah.  What I'm getting at is if these

17   kinds of statements are -- you're claiming cause you

18   irreparable harm, why didn't you -- why haven't you taken some

19   action to remedy that situation or seek injunctive relief for

20   that situation until now?  Why didn't you take any action

21   sooner as we would typically expect somebody who thinks that

22   they have been irreparably harmed to do?

23        THE PLAINTIFF:  So I just don't believe that we've

24   gotten to know each other, or you've gotten to know me or what

25   I've done in my work in this case so far.  I've exhausted every

1    single administrative remedy that I have in order to stop them

2    from at the time making those statements.

3          And then it's not just -- I don't know how to say

4    this, but I think we have another misunderstanding here about

5    the statements being made at OSHA and at CCHR are completely

6    different from each other, but they're also different from the

7    statements made in July 2023 at the time of the termination.

8          So earlier I was asking D. Kays how does she know I

9    have lack thereof, discipline, or where did she get her

10   information from?  And what I would hope is that she can say

11   she got the information from my Illinois personnel records

12   review act, my employee file, that specifically in the letters

13   is cc'ed to go there.  And then when I requested my Illinois

14   file and to dispute my file, I was told not -- no.  And then

15   they did give me my file, but it's incomplete, and I'm not

16   allowed to dispute it which is in violation of that act.

17         And although this is for a temporary restraining

18   order, my next I guess injunction, a proper injunction would be

19   to move for compliance with the records review act and either

20   get to dispute the letters in my file, or under that act, I'm

21   not sure what remedies are available in order -- you know, if

22   they're not letting me dispute the -- the facts of the letter

23   and they're false and, you know, what is the act exactly for as

24   far as just an outline or just a rubber stamp, you know, of

25   saying don't violate the employee's personnel file.

1          And, you know, earlier D. Kays was saying privileged
2   and made in judicial process.  And like I said, if she were to
3   get her information from my personnel file, that's not
4   privileged.  That's personnel files she can use in a
5   disciplinary proceeding.  But as far as my text messages,
6   they're not in my personnel file.  I requested my personnel
7   file in September 2023.

8          And then further than that, DK has just said that she
9   was a party to the text messages supposedly, and she was not a
10  party to either the texts she just shared with CCHR, or she was
11  a party to the communication just shared with the courtroom
12  deputy yesterday, but she did not have two-party consent to
13  share those communications.

14         And where I'm going with that is the TRO does not seek
15  to restrain them describing the case or, you know, explaining
16  her even right now like talking about lack thereof, discipline
17  or, you know, poor performance.  Again, she hasn't really
18  gotten the chance to speak on how does she know that?  Where
19  did she get that information from?  Who told her or where is
20  she getting that conclusion from?

21         THE COURT:  Okay.  It's -- it's -- we've got some -- a
22  variety of I think confused issues here.

23         When Ms. Kays was speaking of, you know, the
24  communications made in this case as being privileged, I
25  understand her to be making the point that, you know, testimony

1    and the admission of evidence in a court proceeding is

2    privileged.  You can't sue someone for defamation, for example,

3    based on their testimony during a court proceeding.  It's in

4    that sense that we're talking about, you know, privileged

5    communications.  And I think Ms. Kays' point is generally

6    valid, that the communications, you know, that are at issue and

7    presented and shared in connection with this court proceeding

8    aren't going to give rise to injunctive relief.

9            Your TRO motion refers to the Illinois Eavesdropping

10   Act, but it doesn't provide any legal discussion about that

11   act.  I have substantial questions about whether that act has

12   any bearing on what I've heard about here which sound like

13   communications between the parties and -- well, between the

14   parties to this case or parties to other administrative

15   proceedings.

16           I have not researched the scope of the Illinois

17   Eavesdropping Act, but it's difficult for me to believe that

18   that prohibits a party from relaying the contents of that

19   communication to -- to which they were a party and you were a

20   party.  I'm not sure why that Illinois Eavesdropping Act would

21   preclude the further dissemination of that information in a

22   call where you were obviously consenting to provide the

23   information to another party.  But, again, I haven't researched

24   the parameters or the scope of the Illinois Eavesdropping Act.

25   But for our purposes this morning, it's certainly not

1  established that there's been any violation of the Illinois

2  Eavesdropping Act, so that's not going to be a basis for the

3  Court to enter a TRO.

4      The concern about Fourth Amendment violations I've

5  already explained don't have any bearing on this case.  This

6  isn't a case that concerns government action which is what

7  would be protected by the Fourth Amendment.

8      And to the extent that we're talking about

9  communications predominantly that were made a year ago or more,

10  it's difficult for me to understand how those communications

11  irreparably harmed the plaintiff given the length of time

12  that -- ago that they were made; again, understanding the

13  plaintiff may be -- have been taking other actions, but -- to

14  try to address his claims.  But in terms of this case and

15  what's been done in judicial proceedings, that's only been

16  initiated within the last couple of months which I think also

17  creates some inconsistency about the claim of irreparable harm.

18      This is -- there are a number of legal doctrines at

19  issue beyond the scope of the TRO as well.  Mr. Szmurlo, you

20  seem to be very diligent in your efforts to pursue your claims,

21  and this ruling does not -- is not intended to have any

22  foreshadowing of the Court's view of the merits of your claim

23  or the lack of merits of your claim.

24      But I don't see at this point any conduct by the

25  defendants that warrants the imposition of a temporary

1    restraining order.  This does not preclude you from seeking a

2    preliminary injunction, but what it should tell you is that you

3    need to provide discussion and legal authority for the

4    injunctive relief that you are seeking.  And I don't think

5    you've satisfied that at present with respect to the motion for

6    a TRO, so I'm not going to grant a TRO.

7         What I am going to do, though, is we're going to

8    revisit the various -- the status of the case and what's been

9    filed and what's pending so that we're all on the same page in

10   terms of what needs to happen next.

11        In that regard, I'm going to first address

12   Mr. Szmurlo's remand motion.  He had originally filed a request

13   to extend his time to respond to the remand motion which I

14   denied because under 1447, the language is mandatory.  As I

15   think Mr. Szmurlo picked up on, however, 1447 doesn't impose a

16   30-day limit if the claim for remand is based on lack of

17   subject-matter jurisdiction.

18        He filed a remand motion on November 12th, I believe,

19   that does raise that question, and so I think that that motion

20   is timely, and that's a motion that I'm going to require the

21   defendants to respond to.  I understand, based on the notice of

22   removal, that the defendants' at least principal argument for

23   removal was preemption.  But you need to -- I'm going to have

24   you respond to Mr. Szmurlo's specific arguments in that regard.

25   We'll get to the dates in a minute.

1     We have, by my count, one, two, three, four, five,

2   six, I think we have six motions to defend -- motions to

3   dismiss by Kone, by Local 2, by the Joint Apprenticeship

4   Committee, by Schindler, by Otis, and by TK Elevator.  Is there

5   any other defendant who has not filed a motion to dismiss?  I

6   don't think anybody has answered the complaint at this time,

7   but is anyone aware of any other defendants that haven't filed

8   a motion to dismiss?

9     All right.  And, Mr. Szmurlo, you have not responded

10  yet to any of the motions to dismiss; is that correct?

11     THE PLAINTIFF:  That is correct.  And I was going to

12  file a motion today to ask to stay the proceedings pending the

13  removal answer or remand answer because the motions to dismiss

14  have different rules in this court and the circuit court where

15  I believe the case belongs.  So I haven't filed the motion yet.

16  It's on my laptop.  I just need to finish it up.  But that's --

17  there's different rules to respond, and I don't want the case

18  to be harmed whatsoever.  You know, if -- like I said, there's

19  different rules to respond to a motion to dismiss in the

20  courts.

21     THE COURT:  Okay.  I'm going to give you time to --

22  well, you filed your remand motion.  We're going to set a

23  briefing schedule on that.  And I won't require you to respond

24  to any of the pending motions to dismiss until I've resolved

25  the remand motion which I think that addresses your concern.

1      So, Ms. Kays, I'll let you continue speaking for
2  everybody here, but my inclination is to give the defendants,
3  we're coming up -- we've got the Thanksgiving holiday I don't
4  want to jam anybody up on.  Let me get my calendar up here.
5      I'll give the defendants until Thursday, December 5th,
6  to respond to Mr. Szmurlo's motion to remand, which is -- I
7  believe it's at docket 54.
8      And, Mr. Szmurlo, I'll give you until Friday, the 20th
9  of December, to file any reply brief.  Does that work for you?
10  I don't want to jam you up on the holiday either.
11      THE PLAINTIFF:  That works good.  Thanks.
12      THE COURT:  All right.  So response to the motion to
13  remand due December 5th; reply, if any, due on December 20th,
14  and I will take that up.  The response to the defendants'
15  motions to dismiss are stayed pending ruling on the remand
16  motion.
17      MS. KAYS:  Thank you, Your Honor.  This is Danielle
18  Kays, and I think that deadline works fine for us.  I think
19  we're intending to file one brief in response to the motion for
20  remand.  And unless anybody else speaks up, I think, you know,
21  we are good with that deadline.
22      THE COURT:  Anyone else have any issues with that
23  schedule?
24      (No response.)
25      THE COURT:  Okay.  Also, Mr. Szmurlo, I think you have

1    a pending motion for leave to proceed *in forma pauperis*.  I

2    think there was previously a request made to proceed IFP which

3    I denied as moot because you had paid the filing fee so I'm not

4    sure why you've filed that motion again.

5            THE PLAINTIFF:  It coincides with the TRO

6    security/bond.

7            And if I may, you know, just speak in closing.  I

8    don't know if there's a time for closing here or if it's just

9    closed; but, you know, they say speak or hold your peace, you

10   know.

11           THE COURT:  Go ahead.

12           THE PLAINTIFF:  Yeah.  Specifically in the TRO, it's

13   been quite a confusing discussion here.  But the old statements

14   at let's just say OSHA, while they're at the time false, right,

15   or what I believe to be false, there was no proof I guess of --

16   or let me reword that.

17           The old statements made at OSHA, there's new proof at

18   CCHR that those statements made under oath are -- were false

19   and, again, that's happening now to where we see -- there's

20   comparison evidence to where we can tell that Danielle Kays

21   just recently at CCHR either got false information or knowingly

22   published false information and the harms from 2023 are

23   revisited -- or not revisited -- relived by D. Kays bringing up

24   new -- new material facts from July '23 which are lies which

25   the OSHA -- OSHA position statement directly contradicts her

1    statements at CCHR.  And it's ongoing at CCHR because she's

2    expected to reply more or, you know, as an ongoing case.

3         And earlier she said that she only sends the

4    statements to CCHR.  That's it.  But the other defendants, the

5    seven other defendants as well have sent the information at

6    OSHA to not just OSHA but different entities of themselves,

7    like to the international or to Maryland or Massachusetts, you

8    know, those offices.

9         And you asked about the irreparable harm occurring.

10   And that's -- it's recent, just recent, like on the 19th.  So

11   two days ago, DK submitted testimony here in this court which

12   is public docket and contradicts her statement at CCHR.

13        So CCHR is not a -- they don't have power to grant a

14   temporary restraining order against what -- what TK is doing,

15   only a federal -- or I mean only a court can do that.  I don't

16   know -- it's not just within this case -- or she said it's not

17   in the complaint so it's not proper.  But the case -- that's

18   fresh.  The 10/21 lies are fresh.  And like I said, OSHA,

19   that's long gone.  You know, they can't do anything about the

20   false light statements now.

21        But if there was no case here, I would still come to a

22   court and ask for a restraining order against the same

23   statements, I mean statements being made by D. Kays.

24        THE COURT:  All right.  Again, you know, statements

25   that Ms. Kays made to this court which you keep adverting to, I

1  don't think it's actually helping your position because that's

2  so clearly not a problem.  It's so clearly not conduct that

3  would be subject to a restraining order, that it further

4  convinces me that there's not a basis being provided at this

5  point for a restraining order.

6        The merits of your claim, you know, may ultimately get

7  resolved if you -- if, you know, they -- the claims aren't

8  ultimately dismissed before we get to a merits resolution.  But

9  you've got a lawsuit to address the merits of your claim that

10  you were defamed.  The communications that are being presented

11  and shared between the defendants to that lawsuit are not going

12  to give rise to injunctive relief.  I'm not convinced that

13  there's any basis for enjoining the defendants from

14  communicating with the Court or with each other or with you as

15  to the merits or lack of merit of your particular claims.

16        So going back to the IFP motion, I'm denying the

17  motion for injunctive relief so that I'll deny -- because the

18  I -- the renewed IFP motion was predicated on, you know,

19  seeking relief from posting a bond.  No bond has to be posted

20  since there was no injunctive relief being granted.  So that

21  motion which is at docket 60 will be denied as moot.

22        All right.  And I -- we also had a motion at docket

23  62, Mr. Szmurlo, for an extension regarding the 11/19 due date.

24  I'm not sure what you were referring to in that motion.  What

25  were you seeking to extend your due date on?

1          THE PLAINTIFF:  That was not a motion to extend

2     anything in this court.  This was evidence submitted to CCHR

3     like to pertain to the TRO motion that, you know, they can't

4     issue a TRO against the statements, but there -- there was hope

5     that the Court could draw the comparison between the statements

6     and at OSHA, CCHR and the July '23 statements and, you know,

7     restrain TK to either talk about the employee personnel file

8     from back then, you know, if they have valid basis to stand on

9     instead of creating new -- new lies, like I'm asking TK if she

10    can answer today how does she know that Pete Szmurlo has bad

11    behavior or needs discipline.

12         THE COURT:  Okay.  Well, if you -- if we get to the

13    point where we have discovery in the case, you'll be able to

14    ask those questions.

15         All right.  So I'm going to deny No. 62 as moot as

16    well in light of the Court's denial of injunctive relief.

17         All right.  So where we are then is we have our

18    briefing schedule on the motion to remand.  Once I rule on that

19    motion, the case will either go back to state court or it will

20    stay here.  And at that point, we'll set a coordinated briefing

21    schedule on the various motions to dismiss, and we'll see where

22    those go.

23         Anybody have any other questions?

24         MS. WRIGHT:  Nothing from Kone.  Thank you, Your

25    Honor.

1        THE COURT:  All right.  That's how we'll proceed.

2   Thank you.

3        We're adjourned.

4        THE PLAINTIFF:  Thank you, Your Honor.

5        MS. KAYS:  Thank you.

6     (Concluded at 12:06 p.m.)

7

8

9                      *   *   *   *   *

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12   */s/Kelly M. Fitzgerald*          *August 29, 2025*
     Kelly M. Fitzgerald
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit D

**UNITED STATES DEPARTMENT OF LABOR OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of:            OALJ Case No.: 2025-SOX-00034

PETE SZMURLO,            OSHA Case No.: 301053843

*Complainant,*

v                          Judge Bell

THYSSENKRUPP ELEVATOR (TKE),

*Respondent.*

---

## COMPLAINANT'S MOTION FOR FIVE-DAY CONTINUANCE, TO COMPEL INITIAL DISCLOSURES, FOR CLARIFICATION OF STAY STATUS, AND FOR AN ORDER DEEMING ADMISSIONS ADMITTED

---

### Table of Contents 9/11/2025

1. EMAIL TO PARTIES ..................................................................................................2

2. JURISDICTIONAL STATEMENT ..........................................................................3
2.1 STANDARD OF REVIEW ......................................................................................4

3. INTRODUCTION ......................................................................................................5

4. STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................9
A. Status of Stay: ............................................................................................................9

B. What Discovery is Needed to Unstay Proceedings: Specific Discovery Needed to Unstay Proceedings: This is not a fishing expedition. We need targeted discovery to prove the fraud:..10
C. By selectively disclosing information to support their preemption arguments in other forums while withholding it here, Respondents have triggered a subject matter waiver FRE 502..........11
D. I operate under no illusion that this tribunal will rule fairly....................................................11
E. Request for court report is statutory .........................................................................................12
F. Even if this Court wrongfully dismisses the case, its power to compel disclosures from TKE to prove fraud will be documented in this journal........................................................................12
G. I also inquire whether Judge Bell has received the OSHA 300 complaint and RFR I filed concurrently with my SOX complaint, as this document is central to the allegations of ongoing recordkeeping fraud and retaliation in 2025...................................................................................13
5. SUMMARY OF THE ARGUMENT ........................................................................13
A. I require adequate time to analyze these developments and respond in writing. First, please confirm the status of the OALJ's stay of discovery. Does this stay remain in full effect? .........13
B. Second, I request that Judge Bell consider issuing a brief written statement regarding the active nature of this SOX complaint and its relation to my ongoing labor dispute and to my inability to meet ABAWD work requirements...........................................................................14
C. What Discovery is Needed to Unstay Proceedings: Specific Discovery Needed to Unstay Proceedings: This is not a fishing expedition. We need targeted discovery to prove the fraud:.........15
6. STATEMENT OF FACTS AND PROCEDURAL HISTORY .............................16
7 ARGUMENT...............................................................................................................18

7.1 PROPOSED STATEMENT ON JURISDICTION, TIMELINESS, CAUSATION & PROTECTED ACTIVITY:....................................................................................18
7.2 SCOPE OF THE NDIL INJUNCTION:......................................................21
7.3 ABSTENTION AND JURISDICTION:.......................................................22
7.4 RESPONDENT'S FAILURE TO PROVIDE INITIAL DISCLOSURES AMOUNTS TO A WAIVER OF DEFENSES UNDER *ADCOCK V. BRAKEGATE* AND FRAUD PRINCIPLES AND JUDICIAL ADMISSIONS WARRANT DEEMING FACTS ADMITTED AND COMPELLING COMPLIANCE....................................................................................22
7.5 2025 CONDUCT IS UNRELATED TO 2023 EMPLOYMENT:................................24
7.6. RESPONDENT'S ADMISSIONS ESTABLISH SOX JURISDICTION AND THE ELEMENTS OF FRAUD UNDER RULE 9(B)........................................................25
7.7. JUDICIAL ADMISSIONS TRIGGER SUBJECT MATTER WAIVER UNDER FEDERAL RULE OF EVIDENCE 502........................................................................30
7.8 ESTOPPEL AND APPARENT AGENCY PRINCIPLES BIND RESPONDENT TO ITS JUDICIAL ADMISSIONS....................................................................................31
7.9 COMPARISON OF JUDICIAL CONDUCT: BELL V. THARP AND WATERS V. FISHER....................................................................................33
8. REQUEST FOR WRITTEN CLARIFICATION AND STAY STATUS..............................35
9. CONCLUSION....................................................................................35

**1. EMAIL TO PARTIES** Dear Mr. Wilke,

Thank you for coordinating the conference call with Judge Bell scheduled for Thursday, September 11, 2025, at 12:00 p.m. Eastern. I am writing to bring several urgent and interrelated matters to the Court's attention, which may impact the scheduling and scope of this call. Two significant developments necessitate this:

· New Disclosures: On September 8, 2025, Respondent's counsel, Paul Waters, made new substantive disclosures via email. These disclosures are complex, appear to involve potential misrepresentations, and are directly relevant to the core jurisdictional and merits issues in this case. I require adequate time to analyze these disclosures and formulate a proper response for the Court before a meaningful conference can be held.

Secondly, Religious Observance from 9:00-3:00pm September 11 is a solemn day of mourning for me and many others for the millions of innocent lives lost globally in the aftermath of the Oklahoma City, 9/11 attacks, including Iraqis, Syrians, Palestinians, and others. My ability to

fully and respectfully participate in a legal proceeding on this day is significantly impaired. SOX was established in 2002.

For the reasons stated below, I formally request this call be postponed and conducted in writing to create a clear record for appellate and collateral review.

Given that Mr. Waters has now effectively admitted to the fraudulent conduct alleged in my complaint, a verbal conference is unnecessary and inefficient. The factual basis for SOX jurisdiction—TKE's U.S. investor communications and the fraudulent concealment of safety records that impact those reports—is now established by Respondent's own counsel. [1]

This Motion arises from Respondent's failure to comply with basic procedural rules and its recent, tactical extra-record disclosures that constitute judicial admissions and have materially altered the scope of this proceeding. A brief continuance is necessary to restore due process, compel compliance, and allow Complainant and the Court to properly address admissions made by Respondent's counsel that establish SOX jurisdiction and the elements of fraud. This request is made on the grounds of religious observance and to ensure this Court does not exceed its statutory authority by deferring to an unlawful injunction from a separate proceeding. [2] A written order from the Court on these jurisdictional and procedural issues would be far more productive than a premature conference call. This would provide a clear record and direction for the parties.

## 2. JURISDICTIONAL STATEMENT

---

[1] '[W]rongdoing by the party in connection with his case, amounting to an obstruction of justice is also commonly regarded as an admission by conduct. By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means.' " (Emphasis omitted.) ( *Lubbers,* 118 Ill. App.3d at 711, 454 N.E.2d at 1191, quoting E. Cleary, McCormick on Evidence § 273, at 660 (2d ed. 1972).) *Kearney v. Brakegate Ltd.*, 263 Ill. App. 3d 355, 361 (Ill. App. Ct. 1994)

[2] Plaintiff, not defendant, should have the power to choose which witnesses plaintiff will call to prove his case.

Jurisdiction is established; respondent is estopped. Mr. Waters's latest disclosures confirm the enterprise fraud conduit theory. [3] NEBA (501c), Otis, & TKE's U.S. investor communications and public safety statistics trigger SOX jurisdiction (18 U.S.C. § 1514A). Their ongoing concealment of OSHA 300/301 violations—a standalone discovery with a 5-year statute of limitations—constitutes a fresh adverse action in 2025, making this complaint timely.

## 2.1 STANDARD OF REVIEW

*FRCP 6(b)(1):* Court may extend deadlines for "good cause." Standard: "Excusable neglect" due to unique circumstances.

Judicial Economy: Postponing correspondence until after Amended Complaint is filed avoids redundant briefing. [4]

Good Cause Shown: Pending Appeals: 7th Cir. Brief sent 9/8/25 will clarify preemption issues under *Lingle v. Norge and Glacier Northwest. S*COTUS Petition: Challenges LMRA preemption split and eavesdropping injunction docketed as an unappealable TRO without rule 65 notice (divests jurisdiction per *Griggs*). Second, plaintiff is simultaneously preparing appellate briefs for both the First District of Illinois Cook County Circuit and a petition to the Supreme Court.[5] Legal Authority *Fed. R. Evid. 201(b)(2):* Court may take judicial notice of pending appeals. Jurisdictional Abstention ignored in Water's 9/8/25 disclosures from D.C. while

---

[3] (Thus it has been said "A man is not to be deprived of his rights unless he has acted in such a way as would make it fraudulent for him to set up those rights." Wilmott v. Barber, 49 L. J. Ch. 792, 15 L. R. Ch. D. 105.)

[4] An implied waiver will occur if the holder of the privilege injects a new factual or legal issue into the case. *Lorenz v. Valley Forge Ins. Co.,* 815 F.2d 1095, 1098 (7th Cir. 1987). Simply denying allegations doesn't amount to a waiver. Such a waiver usually occurs, if at all, when the holder asserts an affirmative defense. *Id.* The question is whether the holder of the privilege uses the privileged communications affirmatively to attack the other side's case. In *Nobles,* for example, the Supreme Court found that defendant waived its work-product privilege as to reports compiled by a defense investigator when the defense called that investigator to testify.

[5] Removal jurisdiction is construed strictly, and any doubts are resolved against removal. *See, Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 911 (7th Cir. 1993).

pending Appeals may resolve threshold issues (e.g., preemption, res judicata). D.C. ignored stay of NLRB and OSHA sox.

Jurisdictional Grounds: *Divestiture Doctrine* (*Griggs v. Provident). P*ending 7th Cir. appeal (No. 25-1941) challenges that Court's SMJ determination. SCOTUS petition (No. ___) addresses circuit split on LMRA preemption. State law claims have Non-Removability. D.C. unlawful prior restraint federal rulings while 7CA appeal pending, while Appeal in Illinois is pending,[6] and while NLRB, IDOL, IPRRA, CCHR, and OSHA is pending. Procedural justice demanded that D.C. cannot properly exercise "discretion" on MTD until Plaintiff explains prior abuses of discretion in appeal and transcript evidence is available, and jurisdiction is determined for each count's removal statute to be not void. Otherwords, substantive rulings should be deferred pending IL appellate guidance.[7]

## 3. INTRODUCTION

Complainant Pete Szmurlo, Pro Se, respectfully moves this Court for an Order:

1. Granting a five-day continuance of all current deadlines;

2. Compelling Respondent to serve complete Initial Disclosures as required by 29 C.F.R. §

---

[6] If federal jurisdiction is based on a federal question, the reference may be to the law of the state governing relations between the parties. *E.g., Board of Regents v. Tomanio*, 446 U.S. 478 (1980).

[7] *Fullin v. Martin*, 34 F. Supp. 2d 726, 735 (E.D. Wis. 1999) ("The foregoing convinces the Court that, to the extent section 1441(c) purports to allow the removal to federal court of state law claims which are factually unrelated to a "separate and independent" federal claim, the statute is unconstitutional.") *Id.* ("Of course, as indicated above, Martin cannot have it both ways. If the state law claims are sufficiently related to the ERISA claim for purposes of supplemental jurisdiction under *Gibbs* and 28 U.S.C. § 1367, then they are not separate and independent for purposes of section 1441(c). If the state law claims are separate and independent from the ERISA claim as required by section 1441(c), then they are not sufficiently related for purposes of pendent jurisdiction.") Id. ("The foregoing strikes the Court as two separate and distinct sets of factual allegations, one set giving rise to the state law claims, the other set giving rise to the federal law claim. Indeed, the only relationship between the claims is that they arose out of the parties' general professional association. "This loose nexus is not enough to warrant the assertion of supplemental jurisdiction." *See e.g., Stadler v. McCullouch*, 949 F. Supp. 311, 313-14 (E.D.Penn. 1996) (fact that ERISA claim and state law claims arose out of the same employment relationship insufficient for supplemental jurisdiction).")

18.50(c);

3. Deeming the specific factual allegations in paragraphs of this Motion admitted by Respondent for failure to comply with discovery obligations and pursuant to judicial admissions;

4. Directing Respondent to provide written responses to the jurisdictional questions outlined herein;

5. Issuing a written clarification of the current stay status for use in Complainant's pending SNAP hearing; and

6. Setting any further hearing dates no earlier than September 20, 2025, after initial disclosures are complete.

I also request that the Court:

A)      Issue a written notice regarding the stay status for use in my SNAP hearing on September 18, 2025.

B)      Lift the stay for the limited purpose of compelling Mr. Waters's compliance with disclosure obligations.

C)      Provide any questions for the conference in writing to ensure I can respond accurately.

D)      Furthermore, to ensure the conference is efficient and builds a clear record, I ask that the Court direct Mr. Waters to clarify the following on the record:

1. The Scope of His 9/8 Disclosures: Specifically, whether his statements connecting TKE's 2023 and 2025 conduct are intended to be judicial admissions for the purpose of this SOX proceeding. Do you concede that your September 8, 2025, disclosures constitute judicial admissions of TKE's ongoing malfeasance in 2025?

2. The Basis for Jurisdictional Arguments: To state unequivocally whether TKE's position is that my 2025 SOX complaint is precluded by the 2023 OSHA dismissal, and if so, to explain how this does not conflict with his admissions of ongoing, related conduct in 2025.

3. Clarification on "Employment": To define whether TKE contends our relationship ended entirely in 2023, which is relevant to the scope of SOX's protection of contractors and agents.

4. How do your September 8, 2025, disclosures—which connect TKE's 2023 OSHA submissions to its 2025 CCHR filings—align with your argument that the 2023 dismissal bars this 2025 SOX case? This implies a continuous pattern of fraud, yet you claim the 2023 dismissal bars this 2025 case constituting independent fraud under Rule 9(b), distinct from the 2023 employment matters?

5. What is the legal basis for applying Judge Tharp's injunction to this 2025 matter, given that you are not a party to that case and the injunction does not address post-2023 conduct employment matters and not the ongoing 2025 fraud? Actions in 2025 are distinct from TKE's 7/13/23 employment matters. Is it your position that Judge Tharp's injunction applies to TKE's 2025 actions, such as its false CCHR submissions and denial of OSHA logs?

6. Why did TKE and Otis use inferior OEM products and falsify safety records? This is not just intentional misconduct—it is a monopoly tactic to dominate the market through deception, harming competitors and investors alike.

7. How do TKE's ongoing statements and actions in 2025—including its communications with me regarding potential reinstatement—square with its claim that our relationship ended entirely in 2023? Why did you lead me to believe reinstatement was possible? Your continued engagement in IPRRA processes and demands for union dues created detrimental reliance, forcing me to forgo reinstatement due to the unsafe environment and ongoing fraud.

8. Why have you failed to file initial disclosures as required, and on what basis do you now seek to waive them?

**E)**     I also request that a court reporter be present to ensure an official transcript of the conference is created, as the details of this discussion are critical for transparency and accuracy.

In support thereof, Complainant states as follows:

**F)**     The purpose of this line of questioning is not to delay but to expedite. Mr. Waters's written responses to these points will provide the clarity needed for Judge Bell to rule on the pending Motion. Understanding that SOX's whistleblower protections can extend to individuals closely associated with a public company, like a contractor or agent, I believe these clarifications are essential. His disclosures are already on the record; we are merely seeking to formalize their legal meaning for this proceeding.

1.     If he argues the 2023 dismissal is final, he contradicts his 9/8 email about ongoing conduct, proving bad faith.

2.     If he admits the conduct is ongoing, he concedes the timeliness and potential merit of the 2025 SOX claim.

3.     Mr. Waters's responses will not only clarify the record but also ensure that this case moves forward based on the merits of the 2025 conduct, not the outdated and misleading arguments rooted in 2023. At this pleading stage, the well-pled allegations of fraud and retaliation in 2025 must be taken as true, and Mr. Waters's admissions only reinforce the validity of these claims. His responses will help establish a clear record for any future proceedings.

4.     I'm asking Judge Bell to use his power to manage his own docket and clarify the record, a perfectly reasonable request that is hard to deny. September 11 is a day of mourning for the millions of innocent lives lost, and it is a painful reminder of how deceit and corruption can knock down pillars of trust—much like how Mr. Waters and TKE have knocked down the

integrity of financial investments and OSHA and CCHR proceedings with falsified disclosures. This is not innocent lawyering—this is a coordinated fraud that echoes the betrayal felt on 9/11. I am a victim of hijacked disclosures and contradictory investment advice, and I refuse to let this corruption stand. I demand that Mr. Waters provide these answers in writing before or during the conference. Proceeding without Respondent's required disclosures and before addressing its admissions would severely prejudice Complainant's ability to fully participate.

## 4. STATEMENT OF ISSUES PRESENTED FOR REVIEW

I seek clarification from the Court on several points crucial to proceeding:

**A. Status of Stay:** Does the OALJ's stay of discovery remain in full effect? This dictates my ability to address Mr. Waters's recent submissions. Is discovery presently stayed, and if so, what steps are necessary to lift the stay for the limited purpose of addressing jurisdictional issues and the new disclosures provided by Mr. Waters on September 8, 2025? These disclosures appear to materially alter the scope of this case, and I require adequate time to respond to their implications. Additionally, I ask for clarification on whether my SOX claims are independent of any LMRA-based issues, as there seems to be confusion in Mr. Waters's recent filings. The heart of my SOX complaint involves alleged fraud under Rule 9(b)—specifically, Waters, Upchurchs, Christensens, Gonzalez, and TKE's material misrepresentations and omissions in its public safety reporting and internal records—which stands separate from any waived in 2023 labor agreement interpretations.

As TKE claims it is traded overseas, that does not negate SOX jurisdiction. Their U.S. investor communications and public safety reports trigger it. The gain for them was defrauding my investment in my apprenticeship and career to conceal their own liability. Most SOX complaints are from insiders with access to reports. I was such an insider. My SOX complaint, filed upon discovering the fraud in 2025, is timely. The 180-day clock began when TKE's

continued concealment confirmed the scheme. If I am disgruntled, I have a right to be. I reported fraud that gets people killed and then was targeted for it.

**B. What Discovery is Needed to Unstay Proceedings: Specific Discovery Needed to Unstay Proceedings: This is not a fishing expedition. We need targeted discovery to prove the fraud:**

We have Mr. Waters's admissions. Mr. Waters's September 8th disclosure intrinsically ties this fraud to TKE's broader legal strategy, omitting the role of their other counsel, Fisher Phillips, in the scheme. My OSHA FOIA request was returned citing a long wait time. The discovery we need is specifically:

· Documents related to the interactive process of sharing my privileged personnel information outside of the employment context, which constitutes a fresh waiver and a new adverse action.

· TKE's internal communications regarding the decision to withhold the OSHA 300 logs in April 2025.

· All documents and communications related to their CCHR submissions in June 2025.

· Records of bonuses, metrics, and performance goals for managers tied to safety metrics and cost-cutting from 2023-present.

· Communications between NEBA, Upchurch, Waters, IUEC, NEIEP, Ed Christensen Jr., TKE, Otis, Kone, and Schindler regarding my employment status and the reasons for it.

· All communications between TKE, NEIEP, IUEC, and Otis from April to July 2025 regarding the decision to deny the existence of records for 12/5/24, 4/21/24, and 9/21/23—the same records I provided to OSHA as proof.[8]

· Complete, unredacted copies of the OSHA 300 and 301 logs for the relevant time periods.

---

[8] Every TK Elevator employee undergoes at least one performance review each year, including a development talk with their supervisor. Page 49

· Internal analyses on the financial impact of injury reporting on insurance premiums and executive bonus metrics.

This discovery will directly show how the concealment of my injuries and safety reports defrauded me and TKE's investors, solidifying SOX jurisdiction and discovery will directly prove the fraudulent scheme alleged in the complaint.

**C. By selectively disclosing information to support their preemption arguments in other forums while withholding it here, Respondents have triggered a subject matter waiver under FRE 502[9].** They are now judicially and equitably estopped from denying jurisdiction or liability. With counsel's liability and futility of this tribunal it is apparent that Mr. Waters is a participant in the fraudulent enterprise, not merely counsel. I intend to add him directly to this action against TKE and I intend to sue him personally under SOX for his role in this scheme. He is not a party to the void NDIL injunction and his conduct is not shielded by it. His fraudulent conduct in 2025 is a standalone adverse action. TKE employed others, like Mr. Waters, to commit wide fraud in investor briefs and financial disclosures. His statements, made from Florida regarding my work in Illinois, were made to conceal fraud and chill reports of whistleblower. Falsified records get workers killed and defraud investors.

**D. I operate under no illusion that this tribunal will rule fairly.** The track record suggests a predetermined outcome. However, this written request serves a critical purpose: to force Respondents to make their false jurisdictional arguments on the record. Each

---

[9] (Kent v. Warner, I2 Allen (Mass.) 56I: "Strictly speaking a waiver is an intentional relinquishment of a known right. But where the endorser of a note by words or acts has in fact misled the holder and put him off his guard and induced him to omit due presentment and notice of non-payment, he is deemed in law to have waived the performance of these cerem because it would be inconsistent with good faith on his part to upon a condition, compliance with which has been prevented own conduct." )
Finally it is of interest to know what rights may in general be waived and what may not be. As a general proposition laid down that any right may be waived unless the waiving of right would be contrary to public policy. That is to say, if the waived right would result in the assertion of a right contrary to the land or to the policy of government, then such waiver would be ineffectual.

misrepresentation by Mr. Waters provides further evidence of the sox conspiracy and waiver of fraud. The ILND judge will get a fair notice due process public jury trial for his criminal misconduct in falsifying transcripts, and that injunction will be overruled. [10]

**E. Request for court report is statutory** given the seriousness of the allegations of whistleblower malfeasance and the potential for new inconsistent statements to be made, besides a written court request I also formally request that a court reporter be present to transcribe the conference call when it is held. I have a critical Fair Hearing with the Indiana FSSA concerning the termination of my essential food benefits (SNAP) scheduled for September 18, 2025. The outcome of this hearing is vital to my ability to survive and continue litigating this case. A conference call or more widely useable by as many people of the public as possible conference in writing, on September 20 would allow me to manage both obligations. The issues are also related, as my blacklisting (the subject of this SOX case) is the direct cause of my need for SNAP benefits.

**F. Even if this Court wrongfully dismisses the case, its power to compel disclosures from TKE to prove fraud will be documented in this journal.** [11] [12]Therefore, I demand the

---

[10] (720 ILCS 5/8-6) (from Ch. 38, par. 8-6)
   Sec. 8-6. Offense. For the purposes of this Article, "offense" shall include conduct which if performed in another State would be criminal by the laws of that State and which conduct if performed in this State would be an offense under the laws of this State.
(Source: Laws 1961, p. 1983.)
(720 ILCS 5/8-1) (from Ch. 38, par. 8-1)
   Sec. 8-1. Solicitation. (a) Elements of the offense. A person commits solicitation when, with intent that an offense be committed, other than first degree murder, he commands, encourages or requests another to commit that offense.

[11] a defendant may raise at any time a claim that the complaint fails to state a cause of action. ( *Wagner v. Kepler* (1951), 411 Ill. 368; *Krachock v. Department of Revenue* (1949), 403 Ill. 148.) However, this exception applies only when a complaint fails to state a recognized cause of action. The exception does not apply where the complaint states a recognized cause of action, but contains an incomplete or otherwise insufficient statement of that cause of action.
[12] Stated more succinctly, courts draw a distinction between a complaint that alleges no cause of action, which may be challenged at any time, and one which defectively or imperfectly alleges a cause of action. *Swager v. Couri* (1979), 77 Ill.2d 173; *Lasko v. Meier* (1946), 394 Ill. 71, 73-74; see, *e.g., Worner*

Court either: a) Postpone the conference and order written submissions on the jurisdictional issues raised by Mr. Waters's disclosures, or b) Proceed with the call only if a verbatim transcript is made, understanding that I will be participating under protest due to the religious observance and the futility of a process seemingly designed to conceal fraud.

These disclosures connect TKE's 2023 conduct to its 2025 legal strategy. This admission proves the fraudulent statements made to OSHA in 2023 were part of a continuing pattern. This ongoing scheme is the precise basis of my 2025 SOX complaint regarding shareholder fraud. This request is made on the grounds of religious observance and to ensure this Court does not exceed its statutory authority by deferring to an unlawful injunction from a separate proceeding. This is not an employment dispute; it is a shareholder fraud case. I was not a TKE employee when I first reported this fraud in 2025; I had been employed by two other companies since my departure in 2023.

Mr. Waters's recent correspondence attempts to conflate these separate issues. His Objection offers no solution on the merits of the 2025 SOX claims but instead admits to the underlying conduct while claiming it is somehow immune. The OALJ has the authority and duty to proceed on the merits of the case before it.

**G. I also inquire whether Judge Bell has received the OSHA 300 complaint and RFR I filed concurrently with my SOX complaint, as this document is central to the allegations of ongoing recordkeeping fraud and retaliation in 2025.**

**5. SUMMARY OF THE ARGUMENT**

---

*Agency, Inc. v. Doyle* (1984), 121 Ill. App.3d 219, *appeal after remand* (1985), 133 Ill. App.3d 850 (although trial court erred in denying the defendant's motion to strike the plaintiff's complaint, which attempted to state a contract action but failed to allege any facts supporting consideration, the error was not preserved for review because the defendant filed an answer after the trial court denied its motion to strike).

**A. I require adequate time to analyze these developments and respond in writing. First, please confirm the status of the OALJ's stay of discovery. Does this stay remain in full effect?** This dictates my ability to address Mr. Waters's recent submissions. I am requesting a postponement of the conference call scheduled for Thursday, September 11, 2025, at 12:00 p.m. Eastern. I also submit this email as my proposed statement for the record, anticipating the Court's questions, to ensure clarity and efficiency when the conference is rescheduled.

**B. Second, I request that Judge Bell consider issuing a brief written statement regarding the active nature of this SOX complaint and its relation to my ongoing labor dispute and to my inability to meet ABAWD work requirements.** Such a statement would be critical for my SNAP Fair Hearing with the Indiana FSSA on September 18, 2025, to demonstrate that ABAWD work requirements are futile due to the blacklisting at the heart of this case as this administrative proceeding demonstrates the futility of my work search due to the ongoing retaliatory blacklisting. Just as an NLRB charge can stay proceedings in ILND and only the Secretary of Labor can promulgate rules or changes, this administrative action should be recognized as a valid basis for deferral. Special circumstances exempting ABAWD requirements pursuant to labor disputes (Sox and NLRB Cases 13-CA-333203) and blacklisting qualify for exemption under 7 CFR SS 273.24(s)(2).

I was a front-line employee for safety and injury protection. I wore safety branding uniforms and held an Illinois elevator license and non CDL.[13] This gave me a de facto ministerial duty to report fraud. TKE's fraud was designed to blame workers for not following license laws and avoid accountability. The blank logs returned to me in April 2025 are proof that records were weaponized. My SOX complaint is timely. The 180-day clock began upon my discovery of

---

[13] **4. Forgetting To Maintain Individual Qualification Files For All Your Drivers** – According to the FMCSA, any of your drivers who is operating a commercial motor vehicle with a GVW of 10,000 pounds or more should have a DOT driver qualification file at all times and it should be maintained regularly.

the fraud in 2025, not the initial fraudulent act in 2023. Furthermore, whether or not I was forced to quit a subsequent job due to the repercussions of TKE's fraud, including their weaponization of doctors' notes and their maintenance of falsified OSHA logs that show no injuries, which is a continuing violation, equitable tolling must apply.

**C. What Discovery is Needed to Unstay Proceedings: Specific Discovery Needed to Unstay Proceedings: This is not a fishing expedition. We need targeted discovery to prove the fraud:**

We have Mr. Waters's admissions. Mr. Waters's September 8th disclosure intrinsically ties this fraud to TKE's broader legal strategy, omitting the role of their other counsel, Fisher Phillips, in the scheme. My OSHA FOIA request was returned citing a long wait time. The discovery we need is specifically:

1. Documents related to the interactive process of sharing my privileged personnel information outside of the employment context, which constitutes a fresh waiver and a new adverse action.

2. TKE's internal communications regarding the decision to withhold the OSHA 300 logs in April 2025.

3. All documents and communications related to their CCHR submissions in June 2025.

4. Records of bonuses, metrics, and performance goals for managers tied to safety metrics and cost-cutting from 2023-present.

5. Communications between TKE, Otis, Kone, and Schindler regarding my employment status and the reasons for it.

6. All communications between TKE, NEIEP, IUEC, and Otis from April to July 2025 regarding the decision to deny the existence of records for 12/5/24, 4/21/24, and 9/21/23—the same records I provided to OSHA as proof.

7. Complete, unredacted copies of the OSHA 300 and 301 logs for the relevant time periods.

8. Internal analyses on the financial impact of injury reporting on insurance premiums and executive bonus metrics.[14]

This discovery will directly show how the concealment of my injuries and safety reports defrauded me and TKE's investors, solidifying SOX jurisdiction and discovery will directly prove the fraudulent scheme alleged in the complaint.

## 6. STATEMENT OF FACTS AND PROCEDURAL HISTORY

**A. Statement of facts**

1. On June 27, 2025, this Court issued a Notice of Docketing, mandating parties to serve Initial Disclosures within 21 days without awaiting a discovery request or order. (29 C.F.R. § 18.50(c)(1)).

2. Complainant timely served his Comprehensive Initial Disclosures on July 18, 2025.

3. Respondent failed to serve any Initial Disclosures by the July 18, 2025, deadline. Instead, on July 21, 2025, Respondent filed an "Objection to Initial Disclosures," seeking to avoid its fundamental procedural obligations.

4. On September 8, 2025, Respondent's counsel submitted a correspondence making substantive, extra-judicial statements that constitute judicial admissions regarding the materiality of fraud alleged in the 2025 SOX complaint.

5. A conference call is scheduled for September 11, 2025. Proceeding on a day of global remembrance without Respondent's required disclosures and before addressing its admissions would severely prejudice Complainant's ability to fully participate.

6. Complainant has a critical SNAP Fair Hearing before the Indiana FSSA on September 18,

---

[14] Merit increases based on each employee's performance (in line with market conditions) Key compensation elements ʅ Strongly performance based short-term incentive (STI) bonuses Page 52

2025, for which a written notice from this Court on the status of this matter is essential.

**B. Procedural Background**

    **1. New Disclosures Concede the Core of the SOX Claim:** The correspondence from Mr. Waters on September 8, 2025, constitutes a critical admission. By explicitly connecting TKE's 2023 conduct to its 2025 legal strategy, he has demonstrated that the fraudulent statements made to OSHA in 2023 were not isolated, but part of a continuing pattern to conceal safety and recordkeeping violations that directly impact investor information. This ongoing scheme—now admitted. [15] These disclosures appear to contradict positions taken in other public or not judicial forums disclosing financial statements, results of operations, transactions, other measures of financial performance, including operational impacts and costs associated therewith. To respond appropriately and ensure the Court has a complete record, I require adequate time to analyze these developments. A verbal conference at this juncture would be premature and insufficient to address these complex matters. These disclosures are complex and materially alter the jurisdictional and merits landscape of this case. I request the Court order all parties to submit their positions in writing to ensure a complete and accurate record, given the demonstrated propensity for misrepresentation and transcript alteration in related proceedings, and no unscheduled conferences, advisements, etc., without at least a schedule notice to prepare.

    **2. Fraud Vitiates All Prior Proceedings:** [16]Mr. Waters's attempt to use a 2023 OSHA dismissal as a shield is invalid. His own September 8th disclosure proves the 2023 OSHA

---

[15] Once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature.

[16] Fraudulent concealment has the same elements with the additional requirement that the plaintiff show the defendant omitted or concealed a material fact when it had a duty to disclose it.

submissions were made fraudulently. Fraud discovered in 2025 cannot be shielded by a 2023 dismissal obtained through that same fraud. This is a new, standalone adverse action based on the discovery of the underlying deceit that taints all prior "final" determinations. The distinction between OSHA statutes confirms ongoing fraud: Mr. Waters's attempt to bar this claim based on a 2023 11(c) dismissal is invalid. There is a critical reason OSHA 300 recordkeeping violations have a 5-year statute of limitations, unlike the 30-day 11(c) window: they represent ongoing, concealed fraud that is not immediately discoverable. TKE claimed this was solely a safety issue, but their blank 300 logs returned in April 2025 prove it was injury-related fraud to lower insurance costs and mislead investors. The 11(c) process gave them a chance to correct safety conditions; their failure to do so and their concealment of injuries confirms the fraudulent intent.

**3. Timeliness is Established by Ongoing Violations:** The 180-day SOX clock begins on the date the fraud is discovered, not the date the initial fraudulent act was committed. The continuous denial of OSHA 300/301 logs in 2025, coupled with Mr. Waters's admissions regarding the nature of the 2024 fraud, constitutes a fresh, actionable adverse action under SOX. The statute of limitations argument is therefore inapplicable. Mr. Waters has now waived defenses by explicitly connecting the well-pleaded facts of my 2024 state court complaint (which alleged perjury to OSHA and subject matter waiver doctrine) to the conduct underlying this 2025 SOX action, far removed from the 2023 employment termination.

**7 ARGUMENT**

**7.1 PROPOSED STATEMENT ON JURISDICTION, TIMELINESS, CAUSATION & PROTECTED ACTIVITY:** My protected activity was reporting fraud to OSHA, CCHR, IDOL, CCCC, TKE and this Court in 2025. The causation is clear: TKE responded to these reports not with correction, but with further adverse actions—specifically, the April 2025 denial of OSHA 300 logs and false June 2025 submissions to CCHR calling me liar and making me

appear dishonest. This pattern of retaliation for challenging their fraudulent statements is the causation. My public reporting to these agencies is protected because it provides information shareholders and the public can use, and it directly relates to TKE's public-facing safety representations.

If the Court questions timeliness, my response is: "My SOX complaint is timely because it is based on adverse actions that occurred within 180 days of filing in May 2025, and ongoing concealment most recently. Specifically, TKE's April 2025 denial of OSHA 300 logs and their June 2025 submissions to CCHR containing false statements. These are not discrete legitimate employment actions but ongoing acts of fraud designed to conceal the original 2023 misconduct from investors and regulators. The statute of limitations for fraud begins upon discovery, which was in 2025."

If the Court questions what specifically occurred within 6 months, my response is: "Within the 180-day window, TKE:

1. Denied OSHA 300/301 records in April 2025, proving the concealment.

2. Submitted false statements to investor reports, otis elevator, NEIEP, the mail, Pacer and Cook county, IDOL IPRRA, IDOL Wage and Hour, and City of Chicago publicly at CCHR in June 2025 regarding July 2023 injury and disability accommodation, further perpetuating the fraud. Claimed to 7CA in July 25 that "everything 7/10/23 occurred during a grievance, LMRA applies" but told public[17] and OSHA 11(c) that "no grievance occurred" on 9/19/23 and accused me of "no call no show" on 7/10/23 and IUEC states no records exist for 7/10/23, no weingarten activity, but Judge Tharp stated discipline was in person 7/10/23, against the face of my complaint and against the reliance TKE gave to OSHA 11(c), whereabouts fraud which taken in

---

[17] We also conform to all applicable laws and regulations across countries and sites. PAGE 51
Where collective bargaining agreements are in place, they specify the applicable consultation periods. If employees feel the need to raise a grievance, they can call our TK Elevator ethics line. Page 51

criminal context can lock away an innocent person for life under Judge Tharp, and under the criminal Court of Appeals of the 7th circuit. [18]

3. Mr. Waters made judicial admissions on September 8, 2025, connecting the 2023 fraud to the 2025 cover-up. These are fresh, actionable violations under SOX."[19]

If the Court questions how blacklisting is different from employment, my response is: "The blacklisting is not a continuation of my 2023 employment termination. It is a separate, post-employment retaliatory scheme intended to punish me for reporting fraud and to deter me from continuing to do so. It is intended to silence a whistleblower and keep the fraud concealed, which directly harms shareholders who rely on accurate safety and performance records. I was not a TKE employee during this blacklisting; I was an external whistleblower."

If the Court questions the basis for reporting fraud, my response is: "My belief is reasonable and based on specific evidence: TKE's own blank OSHA 300 logs, their contradictory sworn statements to different agencies covering up service related disability injury logs accommodations, and their refusal to produce records required by law. This pattern proves a conscious effort to conceal injury data that would impact their public safety reporting and, by extension, investor confidence."

---

[18] *Fullin v. Martin*, 34 F. Supp. 2d 726, 737 (E.D. Wis. 1999) ("It is true that, like any contract, a general release that one party was induced to sign by the fraud of another is unenforceable. *See, Caulfield v. Caulfield,* 183 Wis.2d 83, 92, 515 N.W.2d 278 (Ct.App. 1994) (quoting, *Bank of Sun Prairie v. Esser,* 155 Wis.2d 724, 731, 456 N.W.2d 585, 588 (1990)).")

[19] Id. At 738. Thus, any claims arising out of Martin's actions in this regard are claims arising out of a "prior contractual arrangement between . . . the parties," within the scope of the mutual release. However, the release can only apply to claims that had accrued prior to the date it was signed. The release does not purport to release claims that might arise from any actions taken post-separation, and it would be unusual for a release to waive future claims or causes of action. Accordingly, summary judgment is granted on plaintiffs' ERISA claim insofar as it is based on specific actions taken by Martin prior to the date of the Separation Agreement. However, insofar as the ERISA claim is based on specific actions taken by Martin post-separation, and/or seeks a declaration concerning plaintiffs' rights to post-separation or future plan benefits, summary judgment is denied.

**7.2 SCOPE OF THE NDIL INJUNCTION**: The injunction issued in the Northern District of Illinois (Case No. 1:24-cv-09900) is currently on appeal and, I believe, is void ab initio due to a lack of subject matter jurisdiction. The injunction from the Northern District of Illinois (Case No. 1:24-cv-09900) is based on state law claims from 2023 and is void. It was written on August 27, 2025, just two days before the court produced a falsified transcript on August 29, 2025, which reveals his judicial bias and admission to operating without jurisdiction.[20] This timing was a clear attempt to stop me from suing for the falsified criminal conduct admitted in his own courtroom. His order is so far outside the scope of any legitimate judicial authority that it cannot bar this separate SOX action. A Res judicata filing injunction issued by Judge Tharp in a separate proceeding on August 27, 2025—weeks after this SOX complaint was initiated. Judge Tharp's injunction is unlawful, does not apply to Mr. Waters or this SOX fraud claim, and will be overruled on appeal as it constitutes an impermissible review of state court final judgments.

This SOX action, however, is based on new, independent adverse actions in 2025, including the ongoing denial of OSHA 300/301 records and subsequent disclosures that confirm the fraudulent nature of TKE's public investor safety reports, a distinct proceeding against ThyssenKrupp Elevator for 2025 violations. Mr. Waters is counsel of record in this proceeding, not a party to the NDIL case. I seek confirmation that this administrative action, concerning 2025 conduct, is not barred by an injunction issued in a separate, prior lawsuit. Therefore, I do not believe the NDIL injunction bars this separate administrative action or my communications with the Court regarding it.

---

[20] Refusal to comply with a court order to produce a witness is somewhat similar to destruction of evidence, and "[a]ll reasonable presumptions will be indulged against a party who deliberately destroys evidence." *Haynes v. Coca Cola Bottling Co.* (1976), 39 Ill. App.3d 39, 46, 350 N.E.2d 20, 26.

**7.3 ABSTENTION AND JURISDICTION:** As with open NLRB charges (13-CA-333203) and this SOX proceeding pending, the NDIL's exercise of jurisdiction over unrelated employment matters appears to be an overreach that will likely be corrected on appeal. This OALJ proceeding is the proper forum for the distinct 2025 SOX claims. The Ongoing Stay Nullifies NDIL's Jurisdiction: The OALJ's stay in this SOX matter, and due to pending OSHA and NLRB charges (13-CA-333203), mandated abstention under *San Diego Bldg. Trades v. Garmon*. The Northern District of Illinois (ILND) violated this doctrine and Younger, Pullman, Rooker Feldman, and NoErr Pennington, by adjudicating non-preempted state claims while state or federal agency proceedings were active, plus reviewed criminal IL eavesdropping. The injunction instrument is therefore void ab initio for lack of jurisdiction, an unprecedented matter currently non final or on appeal.

**7.4 RESPONDENT'S FAILURE TO PROVIDE INITIAL DISCLOSURES AMOUNTS TO A WAIVER OF DEFENSES UNDER *ADCOCK V. BRAKEGATE* AND FRAUD PRINCIPLES AND JUDICIAL ADMISSIONS WARRANT DEEMING FACTS ADMITTED AND COMPELLING COMPLIANCE**

I have filed my initial disclosures in compliance with the Court's rules. In contrast, Mr. Waters has failed to file his initial disclosures and now seeks to waive them untimely while making tactical, public-record disclosures on September 8, 2025. Respondent's failure to serve Initial Disclosures is a clear violation of this Court's rules and orders. Its attempt to waive this requirement through an untimely objection demonstrates bad faith. Respondent cannot simultaneously evade its duty to disclose basic information while making selective, false financial disclosures intended to shape the narrative. Its September 8th submissions include judicial admissions that confirm the core elements of the 2025 fraud claims, including material misrepresentations and knowledge of falsity. Pursuant to *Adcock v. Brakegate, Ltd.,* 645

N.E.2d 888 (Ill. 1994), Respondent's failure to produce required discovery constitutes a violation of each count of claims and amounts to a waiver of defenses. The court in Adcock held that a defendant waives any defect in a complaint by filing an answer and proceeding to trial, and the doctrine of *aider by verdict* cures defects after a jury verdict. Here, Respondent's bad faith is further demonstrated by its continuous communications leading Complainant to believe in potential reinstatement while simultaneously engaging in fraudulent conduct ; and by its failure to serve disclosures while simultaneously making selective, extra-judicial submissions intended to shape the narrative. This conduct estops Respondent from denying the validity of Complainant's claims under principles of equitable estoppel.

Respondent's September 8, 2025, correspondence includes judicial admissions that confirm the following facts, which should be deemed admitted for purposes of this proceeding:

1. Respondent TKE and Otis is a subsidiary of each TKE Americas and Otis Worldwide Corporation (NYSE: OTIS), a publicly traded entity. NEBA is a 501(c).

2. Complainant's internal reports in 2025 concerned conduct he reasonably believed violated SEC rules relating to fraud against shareholders.

3. The reported conduct included the falsification of OSHA 300 logs, which directly affect publicly reported safety performance metrics material to investor decisions.

4. The reported conduct included the alteration of personnel records to conceal workplace injuries, thereby artificially inflating operational performance metrics.

5. Respondent maintains an apparent agency relationship with its publicly traded parent, TKE and Otis, for the purposes of public financial and safety reporting.

6. Respondent, through counsel, made false representations to the Chicago CCHR in April and in June 2025 regarding safety records and injury reports.

7. Respondent denied Complainant access to OSHA 300 logs in April 2025, despite their

existence.

8. Internal communications and metadata within Respondent's control prove the backdating and alteration of personnel files.

9. Respondent engaged in a pattern of providing contradictory sworn statements to OSHA, CCHR, and this Court.

10. Investors and regulators justifiably relied on Respondent's false "365-day injury-free" claims in public reports.

11. Respondent's actions were intended to deceive the public, regulators, and investors to lower insurance costs and inflate safety metrics.

12. Complainant suffered ongoing blacklisting and reputational harm as a direct result of his protected activity.

13. Respondent's continuous communications regarding potential reinstatement created detrimental reliance by Complainant.

14. The temporal proximity between Complainant's 2025 reports and the adverse actions establishes a causal connection.

This confirms my role, akin to an internal whistleblower, in reporting a pattern of fraud that continued into 2025. My reports to IDOL (IPRRA) in April 2025, which TKE falsely claimed were themselves fraudulent, were attempts to correct the very false records that mislead investors and regulators. TKE's 2025 responses—including false statements to CCHR and this Court—are themselves new, actionable acts of fraud under SOX, as they are made to conceal the original misconduct from the market and regulators.

**7.5 2025 CONDUCT IS UNRELATED TO 2023 EMPLOYMENT**: Mr. Waters's attempts to tether this SOX claim to a 2023 employment termination are a red herring. By September 19, 2023, I was employed by a different company. This SOX action concerns 2025

conduct: TKE's continued denial of records, its false statements to IDOL and CCHR, and its joint fraudulent representations with entities like NEBA, Otis, Kone, and Schindler that are intended to inflate service costs and mislead the market about their safety and compliance record. This is distinct from any labor dispute and is precisely the kind of investor fraud SOX is designed to address. My SOX complaint, filed upon discovery of the fraudulent pattern in 2025, is timely. The prior OSHA dismissal is irrelevant to these new allegations and was itself based on the now-admitted fraudulent submissions.

For clarity, my OSHA complaint regarding the falsification of OSHA 300 logs was filed concurrently with my SOX complaint. Both are based on the same discovered evidence of ongoing recordkeeping fraud that misrepresents TKE's safety performance to investors and the public.

## 7.6. RESPONDENT'S ADMISSIONS ESTABLISH SOX JURISDICTION AND THE ELEMENTS OF FRAUD UNDER RULE 9(B)

SOX protects contractors and agents of public companies. As a front-line worker in branded safety uniform, I was a de facto representative of TKE's public safety image. My reports to CCHR and this Court in 2025 are protected activity. The fraud I allege—a scheme to monopolize the market by dodging oversight and charging inflated prices through deception—is precisely the type of shareholder fraud SOX is designed to uncover. The question is not immunity, but the procedural right to report and have the claim investigated. A general issue of fact remains, making dismissal for jurisdiction or timeliness inappropriate at this stage.

Although I am not currently an employee, Otis, NEBA, Upchurch, Christensen, Bahl, Hickey, Pipiras, TKE, NEIEP, and IUEC have led me to believe reinstatement is possible through their continued engagement in court proceedings, IPRRA responses, and demands for union dues. This conduct created a reasonable expectation that I might be reinstated at any time,

causing me to detrimentally rely on their representations. If reinstated, I would be forced to quit immediately upon encountering renewed fraud, facing further blacklisting, depression, and anxiety. This is an ongoing adverse action under SOX, as the fraud continues to impact my career and well-being. SOX protects whistleblowers reporting fraud against public companies, regardless of current employment status. The 180-day clock for SOX claims began when I discovered the fraud in 2025, not when TKE's initial violations occurred in 2023.

Statement on the Elements of Fraud (Fed. R. Civ. P. 9(b)) - Your Honor, the complaint pleads fraud with the required specificity & the admissions in Respondent's September 8th submission confirm all elements of fraud with the requisite particularity under Fed. R. Civ. P. 9(b):

· False Representation: TKE's "365-day injury-free" claims, 2025 denial of OSHA 300 logs and false CCHR submissions regarding safety records and injury reports are false statements of material fact. TKE's "365-day injury-free" claims in investor reports (Exhibit C) are false.

· Knowledge of Falsity (Scienter): Internal emails (Exhibit P), the blank OSHA 300 logs (Exhibit F) prove they knew their public statements were untrue and Waters's admissions prove deliberate deceit. Admitted through disclosures regarding internal document practices. Internal communications and metadata prove knowledge, backdating and alteration of personnel files. Mr. Waters's disclosures implicitly acknowledge TKE's awareness of the inaccuracy of their prior representations.

· Intent to Defraud and Deceive: Pattern of contradictory sworn statements to investors, OSHA, CCHR, and this Court to lower insurance costs, inflate safety metrics, and suppress competition. The intent of the pattern of concealing records and providing known false statements across proceedings was to maintain a monopoly by concealing safety failures, injury with light duty and time off, covid related service accommodation, inducing reliance from

investors and regulators.

· Justifiable Reliance: Szmurlo, investors and regulators relied on the false safety records, and relied on TKE's false "365-day injury-free" claims and logs[21], Otis and TKE's misrepresentations. Investors as myself and agencies like OSHA rely on these accurate safety, injury statistics, and financial report disclosures.

· Damages: Complainant's ongoing blacklisting, depression, loss of career, economic harm, and investor deception misleading financial reports. The damage is twofold: (a) my blacklisting and loss of career for reporting the fraud, and (b) investor harm from being misled about the markets true safety and compliance record, to gain a political advantage with Illinois and target the market investors with training and pilot programs under pretext of skill and safety continuing education to bid public projects requiring IL elevator licensed workers, permits, which they control through NEBA 501(c), Otis and TKE's parents to target investments by supplying "OEM" labor and truck drivers without a license[22] or ISO 9001 standards manufacturer requirements. Fraudulently cutting corners and costs by incentivizing manager bonuses to oversee service contracts don't exceed the planned spreadsheet for profit bonuses. TKE submitted knowingly fraudulent disclosures of financial statements on 4/15/25 and 6/16/25 [23]to City of Chicago, which are provably false as I have a log of financial statements from TKE/NEIEP/IUEC/OTIS discussing costs invested in known fraudulent position statements

---

[21] Keep our people safe We build an environment for achieving zero accidents worldwide. Page 45

[22] knowingly `withholding . . . work opportunities from a driver' when it `knew' the driver was unable to lawfully handle the load.
As the preamble to the NPRM stated, a shipper, receiver, or transportation intermediary "may commit coercion if it fails to heed a driver's *objection* that the request would require him/her to break the rules" (79 FR 27267, emphasis added).

[23] In North America, regular joint safety committee meetings at branch level review progress each month. The branch manager is ultimately responsible for the oversight and effectiveness of these efforts. Page 38
We disclosed a total recordable case (TRC1) rate of 0.73 as of September 30, 2023. Page 40

disclosed publicly to defraud the public parent's investment statement and image, under a shell that claims in state court and SOX no jurisdiction, but deeper public investment is political under 501(c) and LMRA to obtain a political advantage against anti-union otherwise defrauding the state of Illinois as well as government roleplayers at OSHA and Paul Waters with the "OSHA ATTORNEY title" is apart of the out of state fraud scheme. A sox finding that a violation occurred to 501(c) or public investment financial disclosures could inherently include an intrinsic private investment fraud scheme or a lawful training program operating in an unlawful manner subject to community investment or wide spread public fraud, charging OEM rates outsourcing costs in an unlawful manner of fraudulent expenditures incentivizing managers bonuses [24] to authorize workers to cut corners beyond what 40 hours costs to sway costs on service plans, making him and 501(c) appear managing better by defrauding business finances to us workers or shareholder or the customer, either making employees buy PPE and crosby clips, not report injuries, or falsely report contract hours on public housing projects or at the nike store, etc.

These admissions constitute subject matter waivers, and Mr. Waters cannot use them as both a shield (to avoid liability) and a sword (to attack my claims). This case involves SOX-governed fraud by a publicly traded entity (TKE and Otis) and its agents, not employment-related matters. The Court must ensure that procedural rules are enforced uniformly and that Mr. Waters's tactics do not undermine these proceedings.

SOX protections extend to employees of privately held subsidiaries when the reported fraud relates to the parent company's financial disclosures. See 18 U.S.C. § 1514A(a).

---

[24] In addition to a competitive base salary, TK Elevator's top executives receive a STI in the form of a variable one-year bonus plus a long-term incentive. Disbursement of the STI depends on the company's and the individual's performance, while generously rewarding executives for outstanding achievements in meeting ambitious goals. Company performance is based on financial KPIs and individual performance in attaining individually agreed targets. Page 52

Complainant's 2025 reports of falsified logs and records constitute protected activity as they directly relate to operational metrics that are material to TKE/Otis's financial reporting and investor decisions. Section 802 criminalizes destruction, alteration, or falsification of records to impede federal investigations. This applies to non profits. Their 501(c) destroyed 2024 financial records to conceal misuse of funds and officer's fraud.

These admissions establish SOX jurisdiction through:

· Protected activity: Reporting fraud affecting publicly traded entity TKE and Otis's financial representations and investor circulations. The company is a subsidiary of a publicly traded entity (as Otis is of Otis Worldwide Corporation);

· Adverse actions: 2025 blacklisting and records denials. The reported fraud relates to the publicly traded parent's financial disclosures;

· Causal connection: Temporal proximity between reports and retaliatory conduct. The whistleblower reports conduct they reasonably believe constitutes fraud under SEC rules.

Here, Complainant's 2025 reports of:

· Falsified OSHA 300 logs affecting safety performance metrics reported to investors

· Altered personnel records concealing workplace injuries, fraudulent disclosures

· Systematic underreporting of safety incidents to inflate operational performance

constitute protected activity under SOX Section 806 as they directly relate to financial disclosures and operational metrics that materially affect TKE / Otis financial reporting and investor decisions.

· Rule 9 Specificity: The complaint details TKE's false "365-day injury-free" claims, blank OSHA logs, and doctored doctors' notes.

· Causation: My reports led to blacklisting and further fraud in 2025.

· Investor Harm: TKE's fraud artificially inflates its safety record, misleading investors and regulators.

· Public Trading: TKE's U.S. investor communications trigger SOX jurisdiction.

· Timeliness: The fraud was discovered in 2025; the clock started then. This Court must choose: will it uphold the law, or will it enable corruption?

### 7.7. JUDICIAL ADMISSIONS TRIGGER SUBJECT MATTER WAIVER UNDER FEDERAL RULE OF EVIDENCE 502

Respondent's extra-judicial statements on September 8, 2025, regarding TKE's recordkeeping procedures:

· Constitute intentional disclosures under FRE 502(a);

· Trigger a subject matter waiver of privilege regarding TKE's recordkeeping and safety reporting practices; and

· Establish the requisite scienter for SOX-protected activity regarding financial disclosures.

His correspondence reveals that TKE's OSHA 11(c) submissions were materially falsified by their subsequent CCHR disclosures. This is not a simple inconsistency; it is an admission that their initial evidence was fraudulent on this Court and shareholders. Under the principles of Rule 502 by making selective, misleading disclosures to this Court, Mr. Waters has waived any privilege or defense concerning this subject matter. He has admitted that the well-pleaded facts of my SOX complaint are true.

· TKE's blanket denial of OSHA 300 logs in April 2025.

· False CCHR submissions in June 2025.

· The weaponization of doctors' notes and injury reports to conceal safety failures and mislead investors.

This is not about my employment in 2023; it is about ongoing fraud in 2025 designed to protect a monopoly controlled by NEBA, Upchurch, Christensen, Pipiras, Hickey, Gonzalez, Otis, Kone, and Schindler. Their collective lies keep competition suppressed and investors deceived.[25]

### 7.8 ESTOPPEL AND APPARENT AGENCY PRINCIPLES BIND RESPONDENT TO ITS JUDICIAL ADMISSIONS

TKE employed others, like Mr. Waters, to commit wide fraud. His statements, made from Florida regarding my work in Illinois, were made to conceal fraud and chill reports of safety violations. Falsified records get workers killed and defraud investors. I was a front-line employee for safety and injury protection. I wore safety branding uniforms and held an Illinois elevator license under common carrier law and IL CDL law which is a felony [26]. This gave me a de facto ministerial duty to report fraud.[27] TKE's fraud was designed to blame workers for not following

---

[25] There is no such thing as accidental, inadvertent or negligent participation in a conspiracy. ( *Jones v. City of Chicago* (7th Cir. 1988), 856 F.2d 985, 993.)

[26] *Guidance:* No. The term "employee," as defined in § 390.5, specifically includes an independent contractor employed by a motor carrier. The existence of operating authority has no bearing upon the issue. The motor carrier is, therefore, responsible for compliance with the FMCSRs by its driver employees, including those who are owner-operators.

[27] "if you don't put the burden of proof on the carrier or dispatcher[,] then it's the driver['']s word against the company and the driver still ends up being punished."

license laws and avoid accountability. [28] The blank logs returned to me in April 2025 are proof that records were weaponized. [29]

Respondent should be estopped from denying SOX jurisdiction where:

· Its continuous communications about reinstatement created detrimental reliance.

· Its apparent agency relationship with publicly traded entity TKE americas and Otis establishes SOX coverage.

· Its judicial admissions in multiple forums constitute subject matter waiver.

     The Stakes of This Fraud: We will not be complicit in this. Falsified safety records get workers killed. I will not stand by while my investment in my career and apprenticeship is defrauded by a company that hides its negligence behind lies. The immense cost of not reporting this fraud is measured in human lives and investor deception. This is the core issue today: Mr. Waters, from his garage in Florida, is crafting stories to protect TKE's fraudulent enterprise, and a federal judge, John Tharp, has issued unlawful orders to shield this criminal misconduct after refusing to recuse himself from a case where he is biased.

---

[28] *Notifying Carriers and Consumer Reporting Agencies.* OOIDA commented that, "One form of coercion and retaliation against drivers is the reporting of negative information about a driver in an employment history submitted to a consumer reporting agency. Other motor carriers purchase that employment history from the consumer reporting agency to fulfill their FMCSR hiring requirements, and they often make negative hiring decisions based on those reports. On their face, some of the information reported appears performance related, such as `late pick-up/delivery.' But there is nothing to protect drivers from being tagged with a negative mark on their employment history if the late pickup or delivery resulted from conditions or circumstances that caused the driver to run out of legal hours to make the delivery on time. Resistance to coercion ( *i.e.,* the driver objections proposed by the Notice) may be reported as `refused dispatch' or `insubordination.' These employment records can effectively disqualify a driver from being considered for employment by motor carriers or make it much harder for the driver to find employment. The result is that safety-conscious drivers who do the right thing and resist coercion get bad employment reports and are driven out of the industry. Other drivers who capitulate to demands to violate the rules and save their jobs can keep fairly clean employment records and stay in the industry. . . . FMCSA should impose penalties upon motor carriers who submit such information to consumer reporting agencies and who refuse to remove such information after it is submitted."

[29] the Agency cannot take action against a carrier for coercion unless there is evidence that an unfavorable report on a driver was motivated by a desire to punish the driver for refusal to be coerced.

This is a 2025 SOX matter concerning ongoing fraud, not a 2023 employment case. The stay was ordered by this Court, and it is for this Court to lift it and proceed on the merits of the new evidence. Mr. Waters's admissions have resolved any question of timeliness or jurisdiction in our favor. This Court must act to uncover the truth that others are trying to bury which this Court must address without cowardice or bias.

I am no longer an employee, but I am a whistleblower reporting fraud that harms shareholders. SOX protects those who report fraud against public companies, regardless of employment status. The 180-day clock for SOX claims began when I discovered the fraud in 2025, not when TKE committed its initial violations in 2023. Each new fraudulent act—each falsified log, each perjured oath—is a fresh adverse action.

### 7.9 COMPARISON OF JUDICIAL CONDUCT: BELL V. THARP AND WATERS V. FISHER

Judge Bell's Duty to Address Fraud First: This Court must address the falsified disclosures before considering jurisdiction or other procedural issues. Fraud vitiates everything, and Waters's admissions have waived any defense to timeliness, jurisdiction, or immunity. This Court must not evade its duty to confront corruption.

The conduct of Judge Tharp in the CCCC case contrasts with the obligations of this Court. Judge Tharp's injunction, issued on August 27, 2025, two days before the hacked production of a transcript revealing judicial bias, is void ab initio due to lack of jurisdiction. He issued it to conceal his own judicial misconduct and bias in transcript release two days later, August 29, 2025. This Court must not capitulate to his unlawful orders. Conversely, Respondent's counsel, Mr. Waters, and his firm Fisher Phillips, have engaged in a pattern of deceptive practices, including failing to file initial disclosures while making extra-judicial

admissions. This Court must not condone such tactics and should compel transparency. Yea this song already was turnt but here's a bell.

This Court's Duty to Proceed on 2025 Facts: Judge Bell should not cower to Judge Tharp's overreach. The stay in this SOX matter was issued by this administrative court, and it is for this Court to resume proceedings based on the facts before it. Mr. Waters's disclosures on September 8, 2025, prove possible tolling and confirm that the 2024-2025 blacklisting and spoliation of records were not discoverable in 2023. These are new claims. [30]

The ongoing denial of OSHA 300 logs and personnel files in 2025 constitutes a new, standalone adverse action under SOX. If I were to quit today over this refusal, it would be a constructive discharge based on this 2025 conduct, not the 2023 termination. Each fraudulent oath submitted to a agency in 2025 is a rolling violation that defrauds my investment in my career and TKE's investors.

Jurisdiction is Plausible and Defenses are Waived: Mr. Waters's 9/8 disclosures have waived any defense to jurisdiction, timeliness, or immunity. By connecting the 2023 fraud to the 2025 cover-up, he has admitted the well-pleaded facts of the SOX complaint. This Court's role is to assess the plausibility of the 2025 claim, not to adjudicate the 2023 employment matter. If this Court were to dismiss and kick this case to federal court today, that would be an agency determination that the injunction does not apply to this distinct 2025 action.

Request for Action from Judge Bell: Instead of a premature conference, I request Judge Bell:

---

[30] Any attempt by a party to conceal or, by threat or otherwise, suppress evidence or otherwise obstruct an investigation is admissible. ( *People v. Gacho* (1988), 122 Ill.2d 221, 247, 522 N.E.2d 1146, 1158.) A jury is entitled to consider the destruction, suppression, or fabrication of evidence, as an admission. M. Graham, Cleary Graham's Handbook of Illinois Evidence § 801.3, at 644 (6th ed. 1994). *Kearney v. Brakegate Ltd.*, 263 Ill. App. 3d 355, 360 (Ill. App. Ct. 1994).

· Order Mr. Waters to clarify his motion. His 9/8 submission requests no relief from this Court and is procedurally irrelevant to the 2025 claims.

· Compel expanded initial disclosures from Respondent regarding the 2025 decisions to deny records and make false statements to CCHR.

· Inspect OSHA's handling of the underlying 11(c) complaint for fraud upon the agency, as it forms the basis of this SOX action.

The fraud alleged is akin to a ruthless killing of accountability, harming taxpayers and investors alike. My conscience requires me to report it to the end. I will not be complicit.

I am available in September. My due date for SCOTUS cert is 9/14/25, and my due date for Appellant brief in CCCC court is 10/1/25, and other ongoing deadlines this month for SNAP and ILND 60b fraud motions. I request this Court proceed on the merits of the 2025 claim and reject any attempt to import the irrelevant and void orders from another court.

### 8. REQUEST FOR WRITTEN CLARIFICATION AND STAY STATUS

Complainant has a critical SNAP Fair Hearing before the Indiana FSSA on September 18, 2025. A written notice from this Court confirming the active status of this SOX matter is essential for that hearing. Additionally, Complainant is hard of hearing and requires written motions and docket entries to fully participate.

A five-day continuance is the minimal time necessary to: (1) Compel Respondent's Initial Disclosures; (2) Allow Complainant and the Court to properly analyze the legal implications of Respondent's admissions; and (3) Ensure a fair and complete record.

### 9. CONCLUSION

Given that Mr. Waters has now provided written evidence supporting the core of my SOX complaint, a verbal conference is insufficient. **I request the Court for the foregoing reasons that this Court grant this Motion**.

a) Postpone the September 11th conference call.

b) Instruct Respondent to file a formal, written response to their own September 8th disclosures.

c) Confirm that this proceeding will address the distinct 2025 SOX claims.

d) Accept this email as my statement on the fraud elements and needed discovery.

e) Unstay discovery based on the specific, targeted requests listed above.

f) Consider issuing a brief statement regarding the active status of this complaint for use in my SNAP hearing.

A five-day continuance of stay is the minimal time necessary to:

· Compel Respondent to finally serve its Initial Disclosures.

· Allow Complainant to integrate Respondent's admissions into his arguments.

· Ensure a fair and complete record for the Court.

I urge the Court to ensure these questions are addressed during the conference. Additionally, I request that a court reporter transcribe the conference to create an official record, given the potential for misinformation. This day demands reflection on truth and accountability—principles that have been systematically violated by TKE and its agents, including Mr. Waters.

I also request that Judge Bell provide written questions or findings to clarify the scope of this conference and the issues to be addressed as Mr. Waters's broad claims and history of deceptive disclosures require a precise and transparent record. Given the complexity of these issues and the need for precision, written responses will ensure a clear record. I request that Judge Bell issue written findings after the conference, detailing:

1. The scope of the call and the specific issues addressed.

2. Whether Mr. Waters's September 8, 2025, disclosures constitute judicial admissions of TKE's 2025 fraud. Did TKE admit that its September 8, 2025, disclosures judicially admit to ongoing fraud in 2025, separate from the 2023 OSHA dismissal?

3. How the ongoing 2025 conduct (e.g., denial of OSHA logs, false CCHR submissions) relates to the 2023 employment matters covered by Judge Tharp's non final currently reviewable injunction. Does TKE concede that its 2025 actions—are distinct from the 2023 employment matters addressed in Judge Tharp's injunction?

Any relief granted must include:

· A written stay notice for my SNAP hearing on September 18, 2025.

· An order compelling Mr. Waters to produce all communications between waters, fisher phillips, TKE, Jack Upchurch, NEBA, OTIS, NEIEP, and IUEC regarding the 2025 fraud.

· A ruling that the injunction does not bar claims against Mr. Waters personally for his role in the 2025 misconduct.

I will not let TKE's corruption go unchallenged. I am preparing for the upcoming conference call in writing and seek clarification on several procedural matters to ensure the efficient progression of this case.

Respectfully submitted,

/s/ Pete Szmurlo Pete Szmurlo, Pro Se 7951 Calumet Ave. #1142 Munster, IN 46321

(219) 544-1724 peterszmurlo@gmail.com September 11, 2025.

CERTIFICATE OF SERVICE        I hereby certify that on this day, September 11, 2025, a true and correct copy of the foregoing Motion was served via electronic email (and or CM/ECF or OALJ E-File) upon: Paul J. Waters, Esq. pwaters@oshattorney.com Waters Law Group 611 S. Ft. Harrison Ave., #304 Clearwater, FL 33756 /s/ Pete Szmurlo Pete Szmurlo

# UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES
### CINCINNATI, OHIO
### (513) 684-3252
### OALJ-cincinnati@dol.gov
_____

Issue Date: 11 September 2025

**OALJ Case No:**    **2025-SOX-00034**
**OSHA Case No.:**    **301053843**

**In the Matter of:**

**PETE SZMURLO,**
Complainant,

**v.**

**THYSSENKRUPP ELEVATOR,**
Respondent.

**ORDER SETTING CONFERENCE CALL**

     I will conduct a telephone conference in this case on Wednesday, September 17, 2025, at 1:30 p.m. Eastern Time.  Please dial 866 615-0013 and use passcode 250 290 00# to join this call.

     I note that Complainant has asked to reschedule the initial conference call scheduled for Thursday, September 11, 2025, to observe the September 11th memorial. This call has been rescheduled to accommodate Complainant.

Steven D. Bell
Administrative Law Judge